No. 47,492

PATRONS STATE BANK AND TRUST COMPANY, *Appellee*, v. DEANE H. SHAPIRO, *Appellant*.

(528 P. 2d 1198)

Opinion filed December 7, 1974.

*Charles S. Schnider*, of Schnider, Shamberg and May, of Shawnee Mission, argued the cause, and was on the brief for the appellant.

*John H. Johntz, Jr.*, of Payne and Jones, of Olathe, argued the cause, and was on the brief for the appellee.

The opinion of the court was delivered by

PRAGER, J.: This is an action in which a bank seeks to hold the president of a defunct corporation personally liable for an obligation of the corporation. The Patrons State Bank and Trust Company was the plaintiff below and is the appellee. We will refer to it as

the bank in the course of this opinion. The action in district court was originally brought by the bank against the appellant, Deane H. Shapiro, and also against the County Lumber and Supply Corporation of which Shapiro was president. In the district court the defendant corporation failed to defend the action and a default judgment was entered against it for the full amount of the obligation plus interest. The area of contest presented in this case has been between the bank and Mr. Shapiro as president of the corporation. In this opinion we will refer to the defendant, Deane H. Shapiro, as Shapiro or the defendant.

Since the question involved here concerns the personal liability of a corporate officer for the obligation of his corporation, the factual circumstances are of prime importance. The case was tried in the district court to a jury which brought in a verdict in favor of the bank against Shapiro for the full amount of the corporation debt. Although there was some conflict in the testimony the factual circumstances established were essentially as follows: On November 26, 1969, Shapiro went to the bank to obtain a loan on behalf of County Lumber and Supply Corporation. Shapiro's dealings with the bank were with Sam G. Perkins, its executive vice-president and trust officer. At the time the loan was negotiated Shapiro had in his possession 11 documents that contained specifications for certain construction contracts to be performed for the Urban Renewal Agency on various tracts of real estate in Kansas City, Missouri. Shapiro advised Perkins that the 11 documents constituted "accepted bids" or contracts by virtue of which the corporation would be paid for services rendered in performing the contracts. Shapiro also furnished the bank a corporate resolution which authorized Shapiro, as president, to pledge for the payment of promissory notes of the corporation all of the bills receivable or other property of the company. It is perfectly obvious from the evidence that these 11 contracts were brought to the bank by Shapiro to provide security for any loan which the bank might make to the corporation. As a matter of fact only two of the 11 contracts were actually in existence on November 26. It is clear from the evidence that Mr. Perkins, as executive vice-president of the bank, had reason to believe from Shapiro's representations that the contracts were binding obligations which could provide security for a bank loan. The bank decided to loan the corporation $30,000 at an agreed rate of interest. As a condition of the loan the corporation agreed to maintain a $7500 certificate of deposit with the

bank as a compensating balance to further secure the loan. A $30,000 note was prepared and signed by Shapiro as president of the corporation. At this point the note was a corporate obligation and not an individual obligation of Shapiro.

At the same time the note was executed Shapiro signed 11 individual assignment forms which were intended to assign each of the 11 contracts to the bank. It was obviously the intent of the bank that the $30,000 loan be secured at least in part by the proceeds of these contracts. In addition to signing the assignment forms, Shapiro executed a financing statement pursuant to the Uniform Commercial Code which stated that it covered the following type of property: "Assignment of Contracts and proceeds thereof". This financial statement was recorded in the office of the Secretary of State of Missouri. Furthermore the bank gave Shapiro a receipt indicating that the bank had received from Shapiro on the date the loan was extended, "the following Urban Renewal contracts" and the 11 documents were thereafter enumerated. It is undisputed that Shapiro assisted an officer of the bank with the names on some of the contracts so that she could prepare the receipt properly. At that point the sum of $22,500 was delivered by the bank to Shapiro as president of the corporation. The evidence discloses that Shapiro had had a great deal of experience in the area of securing financing, had had some legal training, and had borrowed money on many occasions from Patrons State Bank and other financial institutions to finance corporate projects.

Following the execution of this loan as time went by, an additional six of the 11 urban renewal proposals ripened into actual contracts and the corporation proceeded to carry out the construction work provided under them. Thereafter from time to time payments were made under the eight contracts which had been assigned as security at the time the original loan was obtained. The problem arose in this case because most of the proceeds paid under the contracts which had been assigned to the bank were misapplied to pay other obligations or expenses of the corporation.

The evidence further discloses that the original $30,000 promissory note was reduced and was renewed by the execution of renewal notes on five different occasions: January 25, March 26, May 10, July 1, and August 30, 1970. On those renewal dates the balance of the note was actually reduced, not from money paid the bank by Shapiro's corporation from contract payments, but rather by the bank applying a part of the $7500 certificate of deposit to the out-

standing principal balance. On September 24, 1970, the balance owing on the last renewal note was reduced by the sum of $4500 which was the balance remaining in the certificate of deposit held by the bank. The final note was executed on September 29, 1970, in the amount of $15,650 which was due and owing with interest at the time this litigation was commenced. It is clear from the evidence that at the time the various renewal notes were executed, Shapiro advised the officers of the bank that the corporation had not yet received payments on the contracts when in truth and in fact payments had been received by the corporation and had been misapplied on other corporate obligations. At the time of the trial of this case the evidence was undisputed that Shapiro's corporation had received proceeds on the construction contracts totaling $26,-815.43 of which only $6,850 was turned over to the bank to reduce the principal balance owing on the loan. As pointed out above there was a further reduction of the outstanding principal balance by the application of the $7500 certificate of deposit which, of course, had never left the bank. It is clear that $19,965.43 was received by Shapiro's company in contract payments which should have been paid to the bank to reduce the balance of the note but which sum of money was neither accounted for nor turned over to the bank. It is undisputed that the corporation owed the principal balance on the final renewal note in the amount of $15,650 with interest and that the corporation was liable to the bank in that amount.

On the issue of the personal liability of Shapiro as president of the corporation, the evidence showed that he was the managing officer of the corporation. He was one of the principal stockholders, owning 49 percent of the business. Another individual, who owned 49 percent of the stock, had had a heart attack and was not in any way active in the business. Shapiro himself testified that he had the actual capacity as well as the authority to have turned over the assigned contract proceeds to the bank if he had desired to do so. He admitted that he had assigned the proceeds of one of the eight contracts to another bank on June 17, 1970, with full knowledge that he had previously assigned the proceeds of the same contract to the Patrons State Bank on April 7, 1970. In November of 1970 it became obvious to the bank that the corporation was not going to pay off its note and that the corporation was defunct.

On November 9, 1970, the bank sued Shapiro and the corporation. In its petition the bank pled two counts claiming that the defendant Shapiro was personally liable to the bank on the theories

of (1) fraud, and (2) conversion. The bank's theory of Shapiro's liability on fraud was based on the fact that he had falsely represented to the bank that his company, County Lumber and Supply Corporation, had been awarded 11 Urban Renewal Contracts and that work had commenced on each of the contracts and that compensation would be paid for the construction work when in truth and in fact only two of the 11 contracts were actually in existence at the time the original loan was obtained. The bank's claim that Shapiro was personally liable for conversion was based upon the fact that he repeatedly reassigned the proceeds of the contracts to the bank after the contracts actually came into existence and that he personally participated in the conversion of the proceeds from the assigned construction contracts by not paying them over to the bank at the time they were received but rather improperly permitted the proceeds to be misapplied to satisfy other obligations of the corporation.

On trial of the case the trial court submitted the case to the jury on the theory of fraudulent representations and also on the theory of conversion as alternative concepts of recovery. The jury brought in a verdict on the basis of conversion in favor of the plaintiff bank against Shapiro in the amount of $15,650, the unpaid principal balance on the note, plus interest. The defendant Shapiro has prosecuted his appeal to this court claiming trial errors. The trial errors claimed are essentially three in number and are as follows:

(1) The evidence presented did not support a finding of conversion on the part of Shapiro as president of the corporation and the court's instruction on conversion was defective.

(2) The court erred in submitting the case to the jury upon alternative theories of fraud and conversion since they were inconsistent and repugnant theories of recovery.

(3) The amount of the alleged conversion was erroneously computed since the defendant was not given proper credit for certain sums received by the bank on the principal debt.

We will now proceed to consider each of these points separately.

The thrust of Shapiro's first point is that the evidence did not support a claim that Shapiro converted the funds of the bank and that a directed verdict should have been entered in his favor. The basis for Shapiro's position is that there was lack of evidence to show some positive or affirmative act which is necessary to establish a conversion. It is clear from the evidence that the corporation, as the principal debtor on the note to the bank and as assignor of the proceeds to be received from the construction contracts, was liable

in conversion to the bank. Conversion has been defined in a general way as an unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to another, to the alteration of their condition or the exclusion of the owner's rights. (*Watkins v. Layton*, 182 Kan. 702, 707, 324 P. 2d 130.)

Here the evidence showed that the proceeds of the construction contracts were assigned to the bank as security for the $30,000 loan and that payments on the contracts in the total amount of $26,815.43 were received by the corporation. Of these sums received only $6,850 was paid to the bank. The remaining $19,965.43, though assigned to the bank as security, was misdirected by agents of the corporation to pay other obligations of the corporation. This undisputed evidence clearly established a liability for conversion of funds by the corporation and created a cause of action in favor of the bank. The Kansas cases clearly state the rule to be that an assignment passes all of the assignor's title or interest to the assignee, and divests the assignor of all right of control over the subject matter of the assignment. An act of dominion by the assignor over the thing assigned to deprive the assignee of title or right to possession is a conversion for which the assignor may be held liable. If the assignor proceeds to collect the sum due on an assigned chose, the moneys so coming into his hands are regarded as trust funds belonging to the assignee, who may recover the same either in an action for money had or received or *in tort for conversion.* (*First National Bank of Topeka v. United Telephone Ass'n.*, 187 Kan. 29, 353 P. 2d 963, citing 6 C. J. S., Assignments, § 101, pp. 1157, 1158.) Since the corporation used the proceeds of the construction contracts for purposes other than that stated in the agreement of the parties under the assignment, such misuse of the funds constituted a conversion for which the corporation is liable to the bank.

We turn now to the question whether or not the defendant Shapiro, as president of the County Lumber and Supply Corporation, should be held personally liable to the bank. The trial court in this regard instructed the jury as follows:

"INSTRUCTION NO. 14

"You are instructed that an officer of a corporation is personally liable for his acts which constitute a conversion of the property of a third person, and it is no answer to such liability that the act was done while the officer was acting for the corporation. However, an officer of a corporation is not personally liable for a conversion committed by the corporation or one of its officers merely by virtue of the office that he holds; *he must participate or have*

*knowledge amounting to acquiescence or commit a breach of the duty he owes to the owner of the property before he will be held liable.*" (Emphasis supplied.)

The defendant Shapiro on this appeal argues that this instruction misstates the law pertaining to the liability of a corporate officer for the reason that it does not require some positive or affirmative act on the part of Shapiro as president of the corporation in order for him to be liable. In our judgment the instruction given by the court was a good statement of the law and provided the jury with proper guidelines by which it could interpret the evidence. This instruction which describes the liability of a corporate officer for conversion was taken verbatim from 18 Am. Jur. 2d § 127 and is supported by Kansas case law. We note specifically *Sweet v. Bank,* 69 Kan. 641, 77 Pac. 538, where the court states in syllabus ¶ 3:

"*Liability of Officers of Corporation for Conversion of Funds.* Where there were sent to a corporation a note and mortgage, with instructions to collect and remit, and the money was collected but not remitted, a recovery may be had by the owner of the note and mortgage from the executive officers and managing agents having the active management, charge and control of the affairs of the corporation for the conversion of the money by them for the use of the corporation, and also a recovery from them for such conversion of the money by subordinates, with the knowledge and acquiescence of such officers and managing agents."

This same case was again before the court in *Sweet v. Savings Bank,* 73 Kan. 47, 84 Pac. 542, where the same principles of law were recognized and applied.

It is true, of course, that an officer of a corporation is not personally liable for a conversion committed by the corporation or one of its officers merely by virtue of the office he holds. His personal liability is based upon his participation, knowledge amounting to acquiescence or the breach of some duty he owes to the owner of the property. Here the evidence established an active participation by Shapiro as president and managing officer in the conversion of the funds which had been assigned to the bank. It was Shapiro who executed the original note and assignments on behalf of the corporation; he renewed the notes and the assignments on six different occasions. On some of those occasions Shapiro told the officers of the bank that the proceeds from the assigned contracts had not yet been received by the corporation when in fact they had. Shapiro as president wrongfully reassigned the proceeds from one assigned contract to another bank, which actually received the proceeds. Furthermore the evidence supports

the proposition that Shapiro as managing officer of the corporation permitted the assigned proceeds under the contracts to be used to pay other corporate indebtedness or as working capital for the corporation. We have no hesitancy whatsoever in holding that instruction No. 14 correctly instructed the jury on the liability of a corporate officer for a conversion committed by the corporation and that the evidence was sufficient to submit the issue of conversion to the jury.

The defendant's next point on this appeal is that the court should not have submitted the case to the jury upon two theories, fraud and conversion, because in this case they are inconsistent with one another and the court should have required the plaintiff to elect between the two. The doctrine of election of remedies basically precludes a party from having his case submitted on inconsistent theories. The test to be applied in determining inconsistency is whether proof of one theory must necessarily disprove or defeat the other. (*Jayhawk Equipment Co. v. Mentzer,* 191 Kan. 57, 379 P. 2d 342; *Ondrasek v. Ondrasek,* 172 Kan. 100, 238 P. 2d 535.) The question which we must resolve here is whether the two theories —fraud and conversion—pled in the petition and later submitted at the trial are so repugnant as to preclude alternate remedies as a matter of law. The thrust of defendant's argument is that if there were only two of 11 contracts in existence when the loan was originally made there could not be a valid assignment of the non-existent contracts to create property rights in the bank which might be the subject of a conversion. The bank in response takes the position that at the time the false representations as to the 11 contracts were made when the loan was obtained, the representations were fraudulent but that subsequently the construction contracts came into existence and the execution of the later assignments along with renewal notes created rights in the bank which could be converted. It is our judgment that the bank's theories of fraud and conversion were not so inconsistent as to require an election of remedies. The evidence supports the theory that false representations as to the existence of the 11 construction contracts were made at the time the original loan was made by the bank. Furthermore six additional contracts came into existence thereafter which were later assigned to the bank as security for the balance due on the loan. Proof of the fraud theory did not necessarily disprove or defeat the conversion theory. Hence we hold

that an election of theories as between fraud and conversion was properly denied by the trial court in this case. The two theories of fraud and conversion were submitted to the jury as alternative theories of recovery. The jury had the alternative under the evidence to adopt one theory or the other or neither. The plaintiff did not obtain any double recovery in this case and we find no error on this point.

The last issue raised on this appeal by defendant Shapiro concerns the computation of damages. We have considered his position in this regard and find it without merit. The original loan amounted to $30,000 against which was applied a $7500 certificate of deposit maintained by the corporation in the bank. This left a balance owing of $22,500. The total sums paid on the assigned construction contracts to the corporation amounted to $26,815.43. From these funds $6,850 was paid to reduce the debt. This left a balance of assigned sums received and unaccounted for in the amount of $19,965.43. The balance owing on the note was $15,650 plus interest which properly should have been paid from the proceeds of the contracts. In our judgment the trial court was correct in ruling that the computation of the damages awarded by the jury was correct.

For the reasons set forth above we find no error and the judgment of the district court is affirmed.