(823 P.2d 831)

No. 66,525

STATE OF KANSAS, *ex rel.* ROBERT T. STEPHAN, ATTORNEY GENERAL, *Appellee*, v. COMMEMORATIVE SERVICES CORPORATION, NORMAN. ANDERSON, an Individual, *et al.*, *Appellants*.

Opinion filed December 31, 1991.

*Mark Beam-Ward*, of Hill, Beam-Ward & Alberg, of Overland Park, for the appellants.

*Shelly Gasper*, assistant attorney general, and *Robert T. Stephan*, attorney general, for the appellee.

Before LEWIS, P.J., RULON, J., and ROBERT C. HELSEL, District Judge Retired, assigned.

LEWIS, J.: Norman Anderson and Commemorative Services Corporation (CSC) appeal from the entry of judgment against them.

This action concerned the sale of burial markers on a pre-need basis by Anderson, CSC, and a number of related but separate corporations. The litigation has a long history, with roots reaching back to similar litigation in 1965. The present action which was

filed in 1980, has been dealt with by two different district judges, one of whom is now retired. There were numerous other parties to the action, but Anderson and CSC are the only parties remaining.

This action was commenced in 1980 against several defendants. At the time the action was filed, neither Anderson nor CSC were named defendants. Over the next ten years, four amended petitions were filed, and numerous individuals, municipal corporations, and cemetery corporations, including Anderson and CSC, were added and/or dismissed as defendants. As this point, only Anderson and CSC remain.

Procedurally, the State filed for summary judgment on at least three occasions. In 1987, the State was granted summary judgment on the issue of liability by Judge Page W. Benson, who has since retired. In 1991, the matter was tried on the question of damages before Judge John E. Sanders. As a result of the last trial, damages in excess of $210,000 were assessed against Anderson personally and against CSC. This appeal is from the summary judgment determination of liability and from the damages awarded.

Anderson has been active in the business of founding, selling, and operating cemeteries for over 40 years. He has also developed and sold funeral plans and funeral and burial merchandise on a pre-need basis. His activities in the sale of pre-need funeral plans and merchandise has attracted the attention of several attorneys general in this state. Prior to 1965, Anderson was the defendant in a lawsuit similar to the present litigation. In that action, it was concluded that his activities violated several statutes of this state, including K.S.A. 16-301 (Corrick). See State, ex rel., v. Anderson, 195 Kan. 649, 408 P.2d 864 (1965) (Anderson I).

Between 1955 and 1962, Anderson incorporated nine cemetery corporations in the State of Kansas. The exact name of each of these corporations is unimportant, and we shall refer to them as the nine CCs. Anderson owned all of the stock in the nine CCs until 1964, when this stock was purchased by Sacred Gardens, Inc., (SGI). After the sale of stock to SGI, Anderson remained as president and CEO of the nine CCs. Anderson was also president and majority stockholder of SGI when it purchased the

stock of the nine CCs, and he remained in that capacity until 1974 when SGI was dissolved.

CSC is a California corporation. In 1972, CSC purchased the stock of SGI. When SGI was dissolved in 1974, CSC took over direct ownership of the stock in the nine CCs. Although Anderson was a shareholder and a director in CSC when it purchased SGI, he was not an officer of CSC until 1977. In 1977, Anderson purchased the majority stock of CSC and became its president and CEO. He remains, at this time, president and CEO of CSC.

Between 1955 and 1973, the nine CCs formed by Anderson entered into 1,247 contracts for the sale of pre-need burial markers and other merchandise. These contracts were computed to have a wholesale cost of $173,332. Three of these contracts are included in the record, two from 1967 and one from 1962. Each contract contained a "guarantee of performance" clause, which read:

"That in order to assure performance of the delivery of the merchandise and service covered by this Agreement, the *Company agrees that it will set aside and place in a Trust Fund, separate and apart from all other funds, sufficient money, based on its present wholesale price with reliable manufacturers, to pay for said merchandise and services when delivered.*" (Emphasis added.)

It is conceded that, after 1965, no trust fund was established as required by the guarantee of performance clause. Indeed, no monies to fund the purchase of burial markers sold had been set aside as required by the contract and the clause, which is quoted above, when this action was filed.

Between 1974 and 1977, CSC sold the nine CCs to third parties. None of these purchasers is a party to the present action. According to Anderson, the purchaser of each CC was advised of the outstanding marker liability on pre-need contracts sold by that particular corporation. At the time of sale of each CC, the purchaser of that corporation agreed to accept the liability of that corporation with regard to pre-need burial markers sold.

It should be pointed out that some of the markers sold on a pre-need basis have been supplied. It does not appear that there was any evidence of a refusal or failure to supply any markers upon a demand being made.

The State contended that the failure to place in trust the funds collected from the sale of pre-need burial markers violated K.S.A. 16-301 (Corrick), and this action was filed to recover damages under that statute. The State also contends that the actions of Anderson and CSC violated the Kansas Consumer Protection Act (KCPA) (K.S.A. 50-623 *et seq.*) and sought to recover civil penalties and costs of the action under that Act.

The trial court granted the relief sought by the State. It granted an award of damages under 16-301 in the amount of $173,332. These damages were calculated by arriving at the wholesale cost of the burial markers sold by Anderson on a pre-need basis. The order of the trial court required Anderson to place the amount of funds awarded as damages in trust to fund the purchase of burial markers sold on a pre-need basis.

In addition to granting damages under 16-301, the trial court assessed a civil penalty, or fine, under the KCPA in the amount of $31,175 and awarded the attorney general the sum of $10,000 for expenses incurred in the investigation and trial of the lawsuit.

Although the contracts in question were all negotiated by the various CCs in question, the court assessed personal liability for damages and fines against Anderson. It also held CSC to be liable for the judgment granted.

The defendants raise various issues on this appeal.

## IS K.S.A. 16-301 (CORRICK) APPLICABLE?

As originally written, K.S.A. 16-301 (Corrick) read as follows:

"Any agreement, contract or plan requiring the payment of money in a lump sum or installments which is made or entered into with any person, association, partnership, firm or corporation for the final disposition of a dead human body, or for funeral or burial services, or for the furnishing of *personal property or funeral or burial merchandise*, wherein the delivery of the personal property or the funeral or burial merchandise or the furnishing of professional services by a funeral director or embalmer is not immediately required, is hereby declared to be against public policy and void, unless all money paid thereunder shall be paid to and held by a bank or trust company which is authorized to do business in this state, and subject to the terms of an agreement for the benefit of the purchaser of said agreement, contract or plan." (Emphasis added.) L. 1953, ch. 54, § 1.

During the time the pre-need burial markers involved in this litigation were sold, the statute remained in the form quoted

above. In 1973, the following sentence was added to K.S.A. 16-301:

"For the purposes of this act, personal property or funeral or burial merchandise shall include caskets, vaults and all other articles of merchandise incidental to a funeral service, *but shall not include grave lots, grave spaces, grave memorials, tombstones, crypts, niches and mausoleums.*" (Emphasis added.) L. 1973, ch. 86, § 1.

With this addition, and some changes not pertinent herein, the statute remained essentially as originally written.

It is not contested by any party to this action that, since 1973, burial merchandise *does not* include burial markers. As a result, the sale of burial markers on a pre-need basis after 1973 would not violate the statute.

In this case, the alleged violations of 16-301 all took place prior to the 1973 amendment of the statute. The question before the trial court was whether 16-301, as it read prior to 1973, controlled the "pre-need" sale of burial markers. The trial court held that it did and that the failure to comply with the trust fund provisions of 16-301 in the sale of pre-need burial markers was a violation of the statute.

The defendants argue that 16-301 has never applied to the sale of burial markers. They submit that the 1973 amendment did nothing more than clarify the issue. If the defendants are correct, the lawsuit is totally unfounded, and all relief granted to the plaintiff would be reversed. Such a result would greatly simplify this opinion and the disposition of this case. However laudable such a result might be, we disagree with the defendants' reading of the statute and hold that it encompassed and regulated the sale of burial markers during the period of time involved in this litigation.

The statute, prior to 1973, regulated contracts for "the furnishing of personal property or funeral or *burial merchandise*" on a "pre-need" basis. While we are unaware of any clear definition of the term "burial merchandise," we are hard pressed to imagine that a burial marker would not be included in such a definition. We conclude that a burial marker is included in the term "burial merchandise" as that term would be interpreted by a reasonable person. To hold that 16-301 does not, on its face,

include burial markers within its ambit seems to us to be a nonsensical construction of the statute.

" '[I]nterpretation of a statute is a question of law and it is the function of a court to interpret a statute to give it the effect intended by the legislature.' " *State, ex rel., v. Unified School District*, 218 Kan. 47, 49, 542 P.2d 664 (1975). Our review on issues of law is unlimited, and we are not bound in any way by the interpretation reached by the trial court. *Utility Trailers of Wichita, Inc. v. Citizens Nat'l Bank & Tr. Co.*, 11 Kan. App. 2d 421, 423, 726 P.2d 282 (1986).

The argument of the defendants is that, by adding one sentence to the statute in 1973, the legislature only intended to clarify and not change the effect of the statute. Thus, they argue, the language added was only intended to make it clear that burial markers were never intended to be covered by the statute. We disagree. In the context considered, it appears to us that the 1973 amendment was clearly intended to remove the sale of burial markers from regulation by the statute.

The rules of statutory construction employed by this court are well known:

"The fundamental rule of statutory construction, to which all others are subordinate, is that the intent of the legislature governs; the court must give effect to the legislature's intent 'even though words, phrases or clauses at some place in the statute must be omitted or inserted.' [Citations omitted.] In determining legislative intent, courts are not limited to consideration of the language used in the statute, but may look to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under the various constructions suggested. [Citations omitted.] Ordinarily, courts presume that by changing the language of a statute the legislature intends to change its effect. This presumption, however, may be strong or weak according to the circumstances, and may be wanting altogether in a particular case. [Citations omitted.]" *Citizens State Bank of Grainfield v. Kaiser*, 12 Kan. App. 2d 530, 536, 750 P.2d 422, *rev. denied* 243 Kan. 777 (1988).

In *Lakeview Gardens, Inc. v. State, ex rel. Schneider*, 221 Kan. 211, Syl. ¶¶ 1, 2, 557 P.2d 1286 (1976), the court dealt with the interpretation of K.S.A. 16-301. In so doing, it left the following guidelines:

"In determining whether K.S.A. 16-301 applies to particular contracts under facts stipulated by the parties, this court must ascertain and give

effect to the intent of the legislature. In so doing we must consider the language of the statute; its words are to be understood in their plain and ordinary sense." Syl. ¶ 1.

"When a statute is plain and unambiguous this court must give effect to the intention of the legislature as expressed rather than determine what the law should or should not be." Syl. ¶ 2.

In applying the rules of construction cited above, we conclude that the presumption referred to in *Citizens State Bank of Grain-field v. Kaiser*, 12 Kan. App. 2d 530, is not present in the instant matter.

We are cited to legislative history by the defendants to support their contention. We have examined that history and do not find it supportive of the argument advanced.

The history cited consists of letters from the Kansas Cemetery Association (KCA) in support of the amendment adopted in 1973. The letters indicate that this organization did not want any of the products its members sold to be encumbered by the terms of K.S.A. 16-301. Those products were primarily gravesites or lots, tombstones, and burial markers. The KCA strongly supported the amendment to take its products out of the statute. It did what any organization would do if it felt its products were or could be included within the statute. It sought an amendment to take them out.

We are cited to minutes of a house committee where Oscar Brewer, executive director of the Kansas Funeral Directors and Embalmers Association, is quoted as saying, "The amendment does not change the existing law but does have the approval of the Kansas Funeral Directors and Embalmers Association and the KCA." With all due respect to Mr. Brewer, his comments do not seem to us to be particularly illustrative of legislative intent.

The legislative history cited is of the type that can be viewed either way, depending upon the eye of the beholder. As we read it, it is nothing more than the lobbying effort of two groups who want their products removed from the grip of the statute. We view the change in 1973 as substantive in nature and not merely a clarification of how the statute already read.

In *Anderson I*, 195 Kan. at 663, the court stated:

"Upon the facts presented in this record we think the principal object and purpose of the business of defendants is basically that of selling cemetery

lots, burial vaults and markers, and not that of assumption of risks; the latter being merely incidental to the former, or as the parties themselves put it, a 'sales gimmick' or an inducement to the potential customer to buy the merchandise. We have just held defendants accountable under K.S.A. 16-301 for all moneys received for *burial vaults and markers not delivered,* and under K.S.A. 17-1311 for at least ten percent of money received for lots." (Emphasis added.)

Since *Anderson I* dealt only with burial vaults and did not litigate the issue of burial markers, the statement from the court cited above is nothing more than dicta. However, that statement does infer that the court believed burial markers were to be considered burial merchandise under the statute.

In *Lakeview Gardens, Inc. v. State ex rel. Schneider,* 221 Kan. 211, the court took a look back to *Anderson I:*

"Both parties rely heavily on quoted portions of our opinion in *State, ex rel., v. Anderson,* 195 Kan. 649, 408 P.2d 864. Our discussion in that opinion was not limited to the sale of caskets, as it must be in the present opinion. In *Anderson* the provisions of the cemetery corporation contracts examined by this court covered the sale of cemetery lots, the sale of caskets and *memorial grave markers . . . ."* (Emphasis added.) 221 Kan. at 214.

The defendants also rely on *Lakeview Gardens,* pointing out the following language of pages 217-18 of that opinion:

"Both parties rely upon certain abortive legislative proceedings which occurred in 1963 and 1966 in the area of prearranged or preneed funeral contracts. *The wording of the statute which is being considered in the present case has remained unchanged, for all practical purposes, since its enactment in 1953. The change adopted by the legislature in 1973 merely added the last sentence of K.S.A. 16-301 defining burial merchandise."*

The defendants cite the emphasized portion of that statute as being supportive of their argument. They submit that the statement means that the Supreme Court agrees that the 1973 change was nothing more than a clarification. We do not agree. The statement is factual and correct. It does not interpret the statute, nor does it infer that the 1973 change was not substantive but merely a clarification.

Our examination of the statute, its history, and the various authorities which have touched upon it constrains us to hold that the pre-1973 version of 16-301 did cover burial markers. Any other holding would require us to conclude that burial markers are not "burial merchandise." Such a conclusion is untenable and

would twist those words beyond their plain wording and ordinary understanding.

The trial court did not err in holding that the sale of burial markers on a pre-need basis between 1955 and 1973 was governed by the terms of K.S.A. 16-301 (Corrick).

## DOES THE KCPA APPLY?

The trial court found that the defendants' actions were violative of the KCPA, K.S.A. 50-623 *et seq.* The application of the KCPA permitted the court to invoke civil penalties and assess costs of the State's investigation against the defendants. Under this authority, the defendants were fined $31,175 and assessed some $10,000 for the State's cost and investigation expenses.

The defendants point out that the actions for which they were penalized under the KCPA all took place prior to 1973. This is highly significant since the KCPA did not become effective until January 1, 1974. Accordingly, the defendants argue that it was error to assess civil penalties under the KCPA.

The question before this court is whether, under the facts shown, the KCPA could be given retroactive application to punish actions which took place prior to its enactment. After careful consideration, we reverse and hold that the KCPA should not have been given retroactive application and that the judgment against the defendants for civil penalties and costs under that act was error.

"A general rule of statutory construction is that a statute operates prospectively unless there is clear language that it will operate retrospectively. This rule, however, is modified if the statutory change is *procedural only and does not affect substantive rights of the parties.*" (Emphasis added.) *Stevenson v. Topeka City Council,* 245 Kan. 425, Syl. ¶ 1, 781 P.2d 689 (1989). We believe that the rule quoted above mandates our conclusion that the trial court erred in its application of the KCPA. We have examined the statutory enactments and can find no language indicating that the legislature intended that it should be applied retroactively. In addition, we fail to see how it can be argued that the retroactive application of the KCPA to mete out some $41,175 in fines and penalties did not affect the substantive rights of the defendants.

There is no clear legislative intent to require application of anything other than the general rule which has been in effect in this state for more than 85 years. That rule is that a statute will always operate prospectively in the absence of clear legislative intent to the contrary. *State v. Augustine*, 197 Kan. 207, 210, 416 P.2d 281 (1966); *Beeler & Campbell Supply Co. v. Warren*, 151 Kan. 755, 100 P.2d 700 (1940); *International Mortgage Trust Co. v. Henry*, 139 Kan. 154, 30 P.2d 311 (1934); *Douglas County v. Woodward*, 73 Kan. 238, 84 Pac. 1028 (1906).

The effect of the application of the KCPA in the instant matter is to subject these defendants to civil penalties under a law that did not exist when the wrongful acts were committed. The trial judge attempted to justify this application on the theory that the actions of the defendants created harm which was ongoing, extending past the enactment of the KCPA. We can find no authority to support this rationale. We can surmise that many wrongful acts may continue to have adverse consequences for years after they have been committed. However that may be, with the few exceptions not relevant here, our law does not permit imposing penalties on a defendant many years after an offending act has been committed.

At the time the pre-need plans were sold, the KCPA was not in existence and the liabilities sought to be imposed did not exist. "As a general rule retroactive construction will not be given a statute *so as to impose liabilities not existing at the time of its passage*." (Emphasis added.) *Eakes v. Hoffman-LaRoche, Inc.*, 220 Kan. 565, 569, 552 P.2d 998 (1976) (citing 82 C.J.S., Statutes § 418).

"The general rule of statutory construction is that a statute will operate prospectively unless its language clearly indicates that the legislature intended that it operate retrospectively. *This rule is normally applied when an amendment to an existing statute or a new statute is enacted which creates a new liability not existing before under the law or which changes the substantive rights of the parties*." (Emphasis added.) *Nitchals v. Williams*, 225 Kan. 285, Syl. ¶ 1, 590 P.2d 582 (1979).

The imposition of civil penalties under the KCPA effectively created a new liability which did not exist at the time the wrongful acts were committed, and application of the act to these facts is not permissible.

The State argues that the KCPA was a successor to the Kansas Buyer Protection Act of 1968, K.S.A. 50-602 *et seq.* It submits that Act, as well as the common law, allowed remedies for the wrongful acts of Anderson. This argument is without merit. This action was not prosecuted either under the common law or the Kansas Buyer Protection Act. Those antecedents do not legitimize the retrospective application of the penalty provisions of the KCPA. This argument also overlooks the fact that the $2,000 civil penalty created under the KCPA was an entirely new statutory remedy which simply did not exist prior to January 1, 1974.

Our system of justice does not permit the imposition of *ex post facto* penalties for actions committed prior to the creation of those penalties. We hold the application of the KCPA to impose penalties in this case was error, and we reverse that action by the trial court.

## PERSONAL LIABILITY OF ANDERSON AND CSC

The defendants contend that the trial court erred in granting summary judgment against them on the question of liability. We disagree.

The issue arises as to Anderson based upon the trial court's assessment of personal liability against him for his activities while he was president and chief executive officer of the nine CCs and SGI.

Any discussion of liability for corporate debts starts with the basic premise that the corporation and its stockholders are presumed separate and distinct. "Debts of a corporation are not the individual indebtedness of its stockholders." *Amoco Chemicals Corporation v. Bach*, 222 Kan. 589, 593, 567 P.2d 1337 (1977). "It is true, of course, that an officer of a corporation is not personally liable for a conversion committed by the corporation or one of its officers merely by virtue of the office he holds." *Patrons State Bank & Trust Co. v. Shapiro*, 215 Kan. 856, 862, 528 P.2d 1198 (1974).

The liability of Anderson for damages stemming from a violation of the law involving the sale of pre-need funeral plans cannot be predicated on the fact that he was president and CEO of the corporations who sold the plans.

The Kansas Supreme Court has defined what must be shown to impose personal liability upon a corporate officer for wrongful actions of the corporation. " 'The approval or sanction by the directors or officers of a corporation to acts of fraudulent misrepresentation is a sufficient basis for holding them personally liable for damages arising from such fraudulent acts." *Meehan v. Adams Enterprises, Inc.*, 211 Kan. 353, 355, 507 P.2d 849 (1973) (citing with approval *Klockner v. Keser*, 29 Colo. App. 476, 488 P.2d 1135 [1971]). "The directors and officers of a corporation may be held liable for their fraudulent acts to persons dealing with the corporation and suffering damages as a result of their own false representations as to material matters." *State, ex rel., v. Koscot Interplanetary, Inc.*, 212 Kan. 668, Syl. ¶ 7, 512 P.2d 416 (1973). See *Hanson v. Murphy*, 208 Kan. 297, 491 P.2d 551 (1971); *Gray v. Ray Gill, Frontier Industries, Inc.*, 208 Kan. 95, 99, 490 P.2d 615 (1971); Annot., 32 A.L.R.2d 231 § 26. It has been held that "a corporate officer or director acting on behalf of a corporation is personally liable for damages caused by his willful participation in acts of fraud or deceit to one directly injured." *Speer v. Dighton Grain, Inc.*, 229 Kan. 272, Syl. ¶ 6, 624 P.2d 952 (1981). See *McFeeters v. Renollet*, 210 Kan. 158, Syl. ¶ 2, 500 P.2d 47 (1972); *Kirk v. H.G.P. Corporation, Inc.*, 208 Kan. 777, 494 P.2d 1087 (1972).

The law in this state is well settled. An officer of a corporation is personally liable for wrongful actions of that corporation if he approved or sanctioned the action. He is liable if he is personally guilty of making false representation as to material matters in connection with the corporation's action. He is personally liable if he willfully participated in acts of fraud and deceit. This liability does not depend upon piercing the corporate veil or upon the application of any alter ego theory.

In the instant matter, the trial court granted summary judgment against Anderson on the theory that he willfully participated in deceptive acts or misrepresentations. Our review indicates that the trial court did not err in reaching this conclusion.

The rules concerning the granting of summary judgment are well known in this state and need not be recited in this opinion. See *Mick v. Mani*, 244 Kan. 81, 83, 766 P.2d 147 (1988); *Busch*

*v. City of Augusta*, 9 Kan. App. 2d 119, Syl. ¶ 3, 674 P.2d 1054 (1983).

Procedurally, the State of Kansas filed its uncontroverted statements of fact and the defendants filed their response thereto. This procedure is dictated by Rule 141 of the Kansas Supreme Court (1991 Kan. Ct. R. Annot. 117). That rule has been strictly enforced in this state. If the party opposing summary judgment fails to properly controvert the moving party's statements of fact, those facts are deemed admitted. *Slaymaker v. Westgate State Bank*, 241 Kan. 525, 529, 739 P.2d 444 (1987). "Rule 141 is not just fluff—it means what it says and serves a necessary purpose." *McCullough v. Bethany Med. Center*, 235 Kan. 732, 736, 683 P.2d 1258 (1984). The Kansas Supreme Court has stated on many occasions that, in order to survive a motion for summary judgment, the party against whom the motion is filed must do more than simply controvert the facts set forth in the motion. Indeed, that party has an affirmative duty to come forward with facts to support its claim, although it is not required to prove its case. *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 307, 756 P.2d 416 (1988); *Willard v. City of Kansas City*, 235 Kan. 655, Syl. ¶ 2, 681 P.2d 1067 (1984); *Mays v. Ciba-Geigy Corp.*, 233 Kan. 38, 661 P.2d 348 (1983).

A party cannot satisfy Rule 141(b) by merely stating that the facts are "controverted" or "contested." A statement that is not properly controverted with citation to factual authority is deemed admitted. *Danes v. St. David's Episcopal Church*, 242 Kan. 822, 829-30, 752 P.2d 653 (1988).

In support of its summary judgment motion, the plaintiff offered the following, none of which were effectively controverted by the defendants:

"20. Contracts for the sale of merchandise on a pre-need basis by the cemetery corporations contained a 'Guarantee of Performance' clause whereby a separate trust fund would be created containing sufficient money to pay the wholesale cost of the vaults and marker so purchased. . . .

"21. Norman Anderson was familiar with such guarantees of performance, and knew them to be contained in the sales agreements. . . . ,

. . . .

"25. After 1965, no new merchandise trust accounts were set up . . . although representations continued to consumers that such accounts would be set up. . . .

. . . .

"28. Norman Anderson knew of the procedure by which, after 1965, burial marker payments were deposited in general corporate accounts rather than in trust accounts, and were considered as general liabilities."

In addition to those facts, the defendants either did not controvert or did not controvert sufficiently the following facts: (1) the nine CCs sold burial markers on a pre-need basis; (2) Norman Anderson was the incorporator and president of each CC during the time in question; (3) from July 1, 1964, until February 1974, the nine CCs were owned by SGI; (4) during that time, Norman Anderson owned the majority of the stock in SGI and was its president; (5) on February 29, 1972, CSC acquired the stock of SGI; (6) in February 1974, SGI was dissolved and CSC became the sole owner of the nine CCs; (7) Norman Anderson had a role in establishing the company policy of SGI; and (8) at one time, funds to purchase burial markers were held in trust but, in 1967, Norman Anderson, as president of each cemetery corporation, withdrew all of the funds held in trust and diverted those funds to other purposes.

In addition to the facts admitted on the summary judgment motion, Anderson testified in the damage phase of the trial. On this appeal, we have the entire record before us. In the damage phase of the trial, Anderson also admitted that he was aware that each pre-need contract negotiated contained a "guarantee of performance clause." He further admitted that he was aware of the fact that the guarantee of performance clause was not being complied with and that the funds were not being placed in trust as required by the contract.

We have reviewed the record in this case and conclude that the uncontroverted facts established at the time of summary judgment were sufficient to indicate that Anderson was the president, sole shareholder, and CEO of the nine CCs which were selling the pre-need plans. As such, he was clearly involved in establishing policies for those corporations, including policies in dealing with funds received from the sale of pre-need burial markers. He admitted in his testimony that he knew the company was promising consumers that it would place funds in trust and hold them in trust until the time came that the consumer would need the merchandise. In 1967, he personally withdrew the funds his

corporation had promised to hold in trust and applied these funds to other liabilities. From 1965 on, he knew that the pre-need plans sold contained a "guarantee of performance" clause, and he knew that, despite that clause, the corporations were not placing the consumers' funds in trust.

Anderson was an active participant in the sale of the pre-need plans by his corporations. He knew the funds were not being kept in the manner required by the contracts and did nothing to correct the situation. He was an active and willful participant in a scheme in which merchandise was being sold to consumers in violation of the law and in violation of agreements entered into with those consumers. The personal liability of Anderson is clearly established, and the trial court did not err in so holding.

We are not so interested in determining whether Anderson's actions fit the exact legal definition of fraud or misrepresentation. That does not appear to us to be vital. Whatever his action is labeled, the fact is, he participated in taking people's money under the pretext that it would be held in trust. He then became an active participant in dealing with this money in a manner that violated the contractual obligations which were offered to obtain the funds in the first place. To permit him to hide behind the corporate structure under these circumstances would be a miscarriage of justice.

The trial court also assessed personal liability for the damages in this case against CSC. The situation of CSC is considerably different from that of Anderson. During the time the pre-need plans were being sold, CSC was not involved in any way that we can discern from the record. The pre-need plans were being sold by the nine CCs which were owned by SGI. It is obvious that SGI and the nine CCs incurred corporate liability to the consumers for the violation of K.S.A. 16-301 (Corrick) and breach of the agreements entered into with the various consumers. In 1972, CSC acquired the stock of SGI. In 1974, SGI was dissolved, and CSC then owned the stock of the various CCs directly. The liability of CSC is not a direct liability that accrues to it by virtue of it being involved in the sale of plans. The liability of CSC is a derivative liability. It comes about because of the purchase by CSC of the stock of SGI. There is no question from our reading of the record that SGI would be corporately responsible for the

damages assessed in this action. When CSC purchased the stock of SGI, it also purchased its liabilities. We consider the "dissolving" of SGI and the transfer of all of its assets to CSC to be a merger or the functional equivalent thereof. K.S.A. 17-6709 provides:

"When any merger or consolidation shall have become effective under this act . . . all debts, liabilities and duties of the respective constituent corporations shall thenceforth attach to such surviving or resulting corporation, and may be enforced against it to the same extent as if such debts, liabilities and duties had been incurred or contracted by it."

Our Supreme Court recently discussed the concept of merger in *Micheaux v. Amalgamated Meatcutters & Butcher Workmen*, 231 Kan. 791, 797, 648 P.2d 722 (1982):

"In corporation law the 'merger' of two corporations is the absorption of one corporation by another, which retains its name and corporate identity with the added capital, franchises and powers of the merged corporation. It is the uniting of two corporations by the transfer of property to one of them which continues in existence, the other being merged therein. *Cinocca v. Baxter Laboratories, Inc.*, 400 F. Supp. 527 (E.D. Okla. 1975)."

The *Cinocca* case cited by the *Micheaux* court discussed the liability of a corporation remaining after a merger, saying: "The surviving corporation assumes the liabilities, both ex contractu and ex delicto, of the merged corporation. 19 CJS Corporations 1630 (a)." *Cinocca v. Baxter Laboratories, Inc.*, 400 F. Supp. 527, 530 (E.D. Okla. 1975).

We also note that K.S.A. 17-6709 is virtually identical to section 259 of the Delaware General Corporation Law from which it was taken. Del. Code Annot. tit. 8, § 259 (1971). It is, therefore, instructive that Delaware courts have also adhered to the principle of successor liability in corporate mergers. See *Beals v. Washington Intern., Inc.*, 386 A.2d 1156 (Del. Ch. 1978) ("Since Formac is the corporation into which MLZ was merged, it is liable for all the debts, liabilities and duties of MLZ. 8 *Del.C.* § 259."); *Gould v. American Hawaiian Steamship Company*, 331 F. Supp. 981, 998 (D. Del. 1971) ("Reynolds is the surviving corporation after the merger with McLean. As such, it possesses all rights and powers of McLean, as well as all liabilities and duties. See 8 Del.C. § 259.").

Our interpretation of the record is that CSC is the surviving corporation from its merger with SGI. As a result, it assumed all of the liabilities of SGI, including those arising from the acts complained of in the present case. The trial judge was correct in finding CSC liable for the violations of K.S.A. 16-301 (Corrick).

We reach this conclusion, although it is not specifically enumerated in the trial court's decision. We do so on the basis of the often-cited rule that, under the circumstances, if the trial court's decision is right for the wrong reason, its decision will be affirmed. *Prairie State Bank v. Hoefgen*, 245 Kan. 236, 245, 777 P.2d 811 (1989).

## WERE ACTUAL DAMAGES PROVEN?

The defendants contend that no actual damages were proven in the instant matter. It is true, as asserted by the defendants, that there was no evidence presented that there was any consumer who contracted for a burial marker for whom one was not available when needed.

The defendants cite *Apperson v. Security State Bank*, 215 Kan. 724, 735-36, 528 P.2d 1211 (1974), as authority for the fact that no recovery can be had unless it is shown with reasonable certainty that the party seeking recovery has suffered damages.

We agree with the defendants' interpretation of the law in this regard. We do not agree that no damages were shown to exist in this case.

The consumers on whose behalf this action was instituted purchased burial markers under a promise guaranteed to them by a written contract and by the law of this state that the funds they paid would be held in trust until such time as the merchandise purchased was needed. The defendants in this case willfully and wantonly failed to comply with the law of the State of Kansas or the guarantee of performance clause of their own agreements. The consumers' funds were not placed in trust and have not been placed in trust to this day, but the funds have been applied to other purposes.

We do not consider that it is necessary for the State of Kansas to show that a consumer has been denied a burial marker in order to prove consumers have been damaged by the wrongful acts of the defendants. The consumers have obviously been dam-

aged, and the contracts entered into by them with Anderson and his various corporations have been wantonly breached. The funds which they paid under the pretext that they would be held in safekeeping and trust until the merchandise was needed have been applied to other purposes. For this court to hold that they have no remedy simply because they have not as of yet lost their money or been denied a burial marker would be ludicrous. We decline to so hold, and we do hold that adequate damages were shown to exist by the plaintiff in the instant matter. The trial court's award of damages instructed the defendants to place the sum of money awarded in trust and to hold it in trust to fund the purchase of burial markers in the future. We think this to be an appropriate remedy for the damage suffered by the consumers, and we affirm the decision of the trial court in this regard and hold that the defendants' contention that no damages were shown is without merit.

**DEFENDANTS' RIGHT OF SETOFF:**

Finally, Anderson contends that he should have been allowed to set off amounts owed to him by the new owners of the nine CCs. We suspect that his argument in this regard would have some merit in the right context, but we conclude that it has none in the context in which it is raised.

The nine CCs are not parties to this action. The defendants cite no authority to this court to indicate that they would have the right to set off or counterclaim for amounts owed to them by individuals or corporations who are not parties to this action. It is impossible to litigate Anderson's contract claims against the purchasers of the nine CCs without bringing those purchasers or those corporations into the action.

As the litigation now stands, Anderson and CSC are the only defendants. There is no one he can counterclaim against, set off amounts against, or make claims against other than the plaintiff, who is the attorney general of the State of Kansas. Obviously, under these circumstances, Anderson has no remedy to set off the amounts owed to him by the new owners of the nine CCs.

If, in the future, Anderson pays off liabilities which have been agreed to be assumed by the purchasers of one or more of the

nine CCs, we presume he would have a cause of action against that corporation to recover for any debts he has paid on its behalf.

For the purposes of this opinion, we hold that Anderson's contention is without merit. He seeks a remedy which is not possible within the context of the current litigation. The parties whom he contends he should be allowed to set off against are not parties to this action, and, obviously, he will have to seek another forum in which to assert those claims.

Affirmed in part, reversed in part, and remanded with directions to enter judgment in favor of the defendants on all liabilities asserted under the Kansas Consumer Protection Act.