No. 87,418

WILLIAM S. MYNATT and MYNATT TRUCK & EQUIPMENT, INC., a Kansas Corporation, *Appellees.* v. DAVID W. COLLIS and ANN M. HUGHES, *Appellants.*

(57 P.3d 513)

Opinion filed November 1, 2002.

*Anthony F. Rupp*, of Shughart, Thomson & Kilroy, P.C., of Overland Park, argued the cause, and *Susan C. Hascall*, of the same firm, was with him on the briefs for appellants.

*Randolph G. Willis*, of Rasmussen, Willis, Dickey & Moore, L.L.C., of Kansas City, Missouri, argued the cause, and *Matthew S. Jensen*, of the same firm, was with him on the brief for appellees.

The opinion of the court was delivered by

ABBOTT, J.: This is a lawsuit brought by William S. Mynatt, Mynatt Truck & Equipment, Inc. (Mynatt Truck), a Kansas corporation, against David W. Collis and Ann M. Hughes, husband and wife. Highly summarized, the lawsuit was to recover money used

by the two individuals for their own personal use and for punitive damages in favor of Mynatt and Mynatt Truck.

William Mynatt formed Mynatt Truck & Equipment, Inc., in 1988. Mynatt was the president of Mynatt Truck and owned all 1,000 shares of common stock issued. Sometime in 1988, David Collis began working for Mynatt Truck as a mechanic. Mynatt promoted Collis to vice president and general manager in 1990.

On September 30, 1993, Mynatt sold Collis 250 shares of his common stock. Collis executed a promissory note in the amount of $12,500 to Mynatt in consideration for the shares. The promissory note granted Mynatt a security interest in Collis' shares to guarantee the note.

At some point, Mynatt and Collis also formed a company called B&D Leasing to finance sales and make lease arrangements with customers.

From the time of his appointment as vice president and general manager in 1990 until March 1996, Collis was responsible for the review and approval of bills and for determining which general ledger account the bills were to be charged to when paid. Collis was also primarily responsible for opening company mail. Mynatt generally managed corporate sales, leaving responsibility of most of the other operations of Mynatt Truck to Collis. Mynatt and Collis were the only persons authorized to issue corporate checks from 1990 until March 1996. The vast majority of checks issued were signed by Collis. Mynatt only occasionally signed checks.

From 1990 through 1996, Collis routinely brought his two credit card statements and Hughes' credit card statement to work and had Mynatt Truck pay the full balance due, even though the credit card transactions were, for the most part, personal charges. Collis admitted he customarily buried these personal credit card payments by coding them to legitimate business accounts. Mynatt Truck paid Collis' personal credit card charges for such things as visits to a massage parlor, a Nordic Track exercise machine, shotguns and ammunition, boating supplies, and jewelry. Collis never discussed his practice of burying these charges with Mynatt or anyone else at Mynatt Truck and stated that it was not likely Mynatt

could tell the payments were fraudulent by looking at the corporate financial statements.

Collis also issued corporate checks to himself, to his wife, and to cash for his own benefit. During the same time period, it was rare for Mynatt to get checks for cash or cash advances. Collis made a deposit on a Toyota Land Cruiser, purchased a Corvette, paid for a boat dock, and purchased a Kubota tractor and attachments for the tractor with corporate funds. Collis wrote corporate checks to pay for items Hughes purchased to decorate their home. Again, Collis buried these payments paid for with corporate funds by writing the checks to cash or coding the expenses to legitimate business accounts. Collis also engaged in other unauthorized business-swapping transactions where corporate customers Bill Curth, Ronan Roofing, and Arbor Care traded work on Collis' personal residence in exchange for work performed on their vehicles at Mynatt Truck. Collis admitted all these practices were dishonest, fraudulent, and illegal.

In March 1996, Collis resigned as an officer and shareholder of Mynatt Truck, taking a company truck and tools with him. Collis formed Collis Equipment Company, a direct competitor with Mynatt Truck. In May or June 1996, Collis returned to Mynatt Truck and blacked out most of the information regarding his personal expenses on his credit card statements.

In March 1997, Mynatt and Mynatt Truck filed suit against Collis and Hughes. In the petition, Mynatt made an individual claim against Collis for amounts owing on the promissory note. Mynatt additionally asked the court to determine that certain real property titled in the names of Mynatt, Collis, and both of their wives was held in trust for Mynatt Truck, or alternatively sought a reformation of the deed to reflect ownership by the corporation.

Mynatt and Mynatt Truck together alleged that Collis wrongfully used or dissipated corporate assets to benefit himself and Hughes. Collis and Hughes generally denied the allegations and contended that Collis had been authorized to use corporate assets for his personal benefit. In addition, Mynatt and Mynatt Truck advanced claims against Collis for conversion and unjust enrichment, fraud,

and breach of fiduciary duty. Mynatt Truck also sought judgment against Collis and Hughes for business loans advanced to Collis.

Collis filed a counterclaim alleging that Mynatt dissipated corporate assets of Mynatt Truck for his own benefit and failed to pay Collis for 55 days of vacation. Collis asserted that Mynatt used corporate funds to pay for personal expenses, an airplane, life insurance, personal income taxes, legal and accounting fees, and family travel expenses. Collis also sought the dissolution and an accounting of B&D Leasing, the general partnership owned by Collis and Mynatt.

Prior to trial, Mynatt and Mynatt Truck asked for leave to seek punitive damages pursuant to K.S.A. 2001 Supp. 60-3703. Following a hearing, the district court granted leave to claim punitive damages.

A 7-day bench trial was conducted by Judge Leben in January and April 1999. The district court issued a memorandum decision summarizing its findings of facts and conclusions of law on March 16, 2001.

In its findings of fact, the district court specifically found:

"7. Although a variety of expenditures were made for the benefit of Collis' wife, Ann, she was never an employee of Mynatt Truck. Although Collis indicated that she ran some errands for the company, he agreed that she rarely did so after 1992.

"8. Collis admits taking about $5,000 to $6,000 worth of tools with him when he left Mynatt Truck. (At a later point in his testimony, during the second part of the trial—which took place about three months after the first part—Collis claimed he only took about $2,000 worth of tools when he left. This unexplained, significant difference is typical of his testimony. The court accepts the statement he made on this subject from the first day of his testimony, which was based on his earlier deposition testimony.)

"9. A Kubota tractor was purchased by Collis with company funds. It never had any business purpose. Collis took the tractor home with him and still has it. Mynatt Truck paid approximately $12,000 for the tractor.

"10. On the Curth transaction, Collis admitted at one point in his testimony that he actually wasn't sure that he ever 'settled up with' Mynatt regarding that transaction. Previously, he had testified that he had paid Mynatt about $2,500 in connection with the Curth transaction.

"11. Collis' basic claim was that he had had a conversation with Mynatt in 1990 in which Mynatt had authorized the compensation over and above Collis' salary that Collis took in the ensuing years. Collis' own testimony, however, really didn't support that claim. Collis testified that he and Mynatt had discussed Collis' desire

for a raise in 1990 and that Mynatt had told Collis that the company didn't have enough money to give him a raise, but that Collis could 'pad [his] expense account a bit.' Even if that were true, padding the expense account 'a bit' would not have been authority for the wholesale expenditures made for Collis' personal benefit. Collis' recollections of this conversation with Mynatt varied in significant respects between his deposition and trial testimony and even within his trial testimony. The court recognizes that it is difficult for any witness to keep any story 100% straight over an extended period of time,' even if it is the truth. In this case, however, the changes and variances were significant and the court simply does not believe Collis' version of these events.

"12. Collis agreed that he owed Mynatt Truck for a number of the checks written for his personal expenses, including all of those in category F on Exhibit HHHH. There is no logical reason why he should owe for these checks, in relatively modest sums, if, as he claims, Mynatt had authorized the taking of much larger sums as part of the 'padding' of his expenses or even a greater agreement designed to increase Collis' compensation from Mynatt Truck.

"13. As examples of some of the checks written by Collis, check number 5283 was written to his wife for $4,500. Collis, in his own handwriting, coded that to the equipment inventory account on the general ledger of Mynatt Truck. Check number 5889 for $12,100.35 went to pay off Collis' boat loan; Collis coded that to the equipment inventory account as well. Check number 6347 for $5,439.19 for down payment on a personal Toyota Land Cruiser was coded to the company's parts inventory. Check number 6013 for $1,187.07 for an attachment for his tractor was coded to the company's parts inventory.

"14. Mynatt Truck, with the concurrence of Mynatt and Collis, declared a $50,000 bonus for Mynatt and Collis in 1995. No bonuses were declared or awarded at any other time. Plaintiffs have credited this bonus against the amounts claimed against Collis; the court finds that this is an appropriate method for calculating the damages, while honoring the bonus agreement.

"15. Mynatt admits that he received cash that was not reported as income or included on the company's books in four or five significant deals, all negotiated by Collis. Mynatt admits having received $12,000 cash on the Century Lumber deal, a transaction on which Mynatt has made some claims in this lawsuit.

"16. In late 1995, Mynatt and Collis had a meeting regarding a list of questionable checks that Collis had written on the company accounts. The checks written by Collis to purchase the Kubota tractor and its attachments were included among those discussed. After the meeting, Mynatt wrote a check to himself on the company account for $17,000. He did this because Collis had taken the Kubota tractor for his personal use and Mynatt felt that a compensating payment should be made to himself.

"17. Some expenses of Mynatt's wife, including gas expenses, were paid by Mynatt Truck. She did not do any work for the company, but did serve as a corporate director and was a guarantor of the corporation's debt.

"18. Although Collis now complains about various payments made by the corporation for Mynatt's personal benefit, Collis was aware of virtually all of those expenses as they were made. Collis signed the checks and coded the payments for purposes of the corporation's accounting records.

"19. Although Collis claims that his payment of large personal expenses with company funds was authorized, on at least three occasions he charged significant expenses against his own loan account on the corporation's accounting ledgers. No satisfactory explanation for why this was done in three cases, but not in others, was given.

"20. After Collis left Mynatt Truck, he returned to the business, took his credit card statements, and blacked out most of the information regarding his personal expenses.

"21. Collis agrees that he failed to 'settle up' with Mynatt regarding the Arborcare transaction.

"22. Collis admitted that his paying for a Corvette through the corporation, when he already had another corporate vehicle, was not a proper corporate expense. (Later in his testimony, Collis took the opposite position. The court agrees with his admission.)

"23. Collis admitted that his subscription, paid for by the company, to Star Tech journal was improper, as that journal did not relate to the industry in which Mynatt Truck operated.

"24. The policy for all employees at Mynatt Truck—established by Collis—was that vacation time had to be used during each calendar year or it was lost. This was true for Collis as well as for other employees.

"25. Collis agreed that he owed the following:

• $8,933.37 plus interest of $1.24 per day after January 15, 1999 on the promissory note given by Collis for his shares of Mynatt Truck;

• $10,000 for Mynatt's interest in HRE stock;

• $17,100 for the pickup truck taken by Collis at the time of his resignation;

• $46,928.45 in credit card charges that were his personal expenses paid for by the corporation (admitted to once his claim that Mynatt had agreed that Collis could run virtually unlimited personal expenses through the corporation is rejected); and

• $2,074.62 in checks identified in category F on Exhibit HHHH.

"26. The court did not find Collis' testimony to be credible for a number of reasons, some of which have been mentioned here. The court generally agrees with the discussion found in paragraphs 4 through 7 of plaintiffs' proposed findings regarding Collis' credibility.

"27. Mynatt never authorized the paying of large quantities of Collis' personal expenses with corporate funds or the 'burying' of Collis' personal transactions in the corporate books by coding them to non-personal account categories.

"28. Mynatt did pay some personal expenses with corporate funds, something that is not infrequent—in relatively modest amounts—in closely held corporations, its legality (or illegality) notwithstanding. Mynatt's expenditures of this na-

ture did not approach the level of Collis', however. Nor did Mynatt authorize the large-scale personal expenditures from corporate funds, which was mostly engaged in by Collis without Mynatt's knowledge or consent.

"29. Collis engaged in several 'trade-outs' in which he obtained services from third parties for himself, personally, in exchange for equipment or services of Mynatt Truck. By this practice, Collis received personal benefits that were paid for by the company. Mynatt was aware of this practice in some instances, but not aware of it in others. Such transactions were not generally authorized. Thus, unless specific authority from Mynatt was shown, they should be considered unauthorized self-dealing by Collis.

"30. The Curth trade-out, which netted a value of $5,000 for Collis, was not authorized by Mynatt and Mynatt was unaware of it. The same is true for the Arborcare trade-out, which netted a value of $2,000 for Collis.

"31. The Ronan Roofing transaction, in which Collis received value of $6,800, was not authorized by Mynatt and Mynatt was unaware of it. Collis coded the payment to Ronan Roofing, in exchange for which he received services, to a Mynatt Truck repairs account.

"32. The trade-out with Bolivar Insulation was known to Mynatt and authorized by him. Collis testified that he shared a cash payment from Bolivar with Mynatt. Mynatt agreed that he received some cash payments. The court finds that Bolivar Insulation was one of them.

"33. Plaintiffs have presented a claim that Collis should reimburse checks written by him with respect to three categories. The first category, totaling $39,964.43, is for checks payable to cash; the second, totaling $17,883.33, is for checks written to purchase tools; the third, totaling $36,090.36, is for checks written to various third parties for Collis' benefit. The court finds that plaintiffs have a valid claim under the first and third categories, but not the second. Collis has provided a sufficient explanation for the purchase of tools, which are certainly needed in the normal operation of the business, to justify substantial expenditures. The court has separately found, however, that Collis admitted taking $5,000 to $6,000 in company-owned tools with him when he left the company's employment. Thus, the court finds damages of $5,000 with respect to the claim regarding tools in place of the $17,883.33 claimed by plaintiffs.

"34. As noted in the court's legal conclusions, Collis, as a fiduciary, had the burden to prove the propriety of questioned transactions once a prima facie showing of impropriety had been made. Plaintiffs did so with respect to the transactions for which damages have been awarded and Collis did not adequately prove the appropriateness of his dealings. It may well be that some of the cash obtained by Collis was for legitimate purposes. In light of the large sums that Collis took from the corporation for illegitimate purposes, however, it cannot be presumed that these cash payments were proper. Collis has no records to support his claims that they were appropriate and plaintiffs rightly point out that Collis' credit card charges for gas would have provided most or all of his appropriate gas reimburse-

ments. Collis' other explanations for the checks for cash and to third parties are found insufficient to explain away the apparent improprieties of these transactions.

"35. No damages are awarded to plaintiffs with respect to the Century Lumber claim. Because no damages are awarded on it, the court will not recount in detail the convoluted nature of this transaction and claim. The court rejects any damage claim associated with this transaction because Mynatt admits having received $12,000 in cash (along with Collis) in connection with the underlying transaction; Mynatt Truck or B&D Leasing or both retain a claim against Century Lumber that has not yet been pursued. Further, no evidence was presented that tied Collis into the apparent fraud in the transfer of title to the truck originally sold to Century Lumber by B&D Leasing. Given that this transfer of the truck title, free of the lien of either B&D Leasing or Mynatt Truck, was apparently fraudulent, substantial proof of Collis' involvement would have been required. It simply was not present.

"36. No damages are awarded to plaintiffs with respect to the Kubota tractor transactions. Mynatt, in response to the Kubota tractor transactions, wrote a check to himself from the corporation in an equivalent amount to make up for Collis' self-dealing on these transactions. Mynatt concluded at the time that the payment to himself equalized those disbursements. While Mynatt did not authorize the Kubota tractor transactions in advance, his payment of an equivalent amount to himself later constituted an after-the-fact ratification of the Kubota tractor payments.

"37. The court rejects plaintiffs' claim for $13,481.19 in 'questionable' credit card charges or for $8,643.43 in credit card charges for 'meals' over a five-year period. Unlike the blacked out charges, the court does not find sufficient evidence of the impropriety of these transactions to require more-than-normal proof by Collis of the appropriateness of these transactions. Certainly some expense for meals, including on occasions when customers may have been entertained, would have been appropriate. Given the length of the time period involved in these claims, there is not a sufficient showing that these transactions were improper.

"38. The court rejects plaintiffs' claim for $8,000 arising out of a loss on trade-in of a Winnebago. The court finds that plaintiffs failed to prove that this loss was caused by any improper or unauthorized act of Collis.

"39. The court rejects plaintiffs' claim of damages related to an Army truck. Collis has stated that he will sign the title to the truck, which would obviate any damage claim. The court will include an order for Collis to sign the title and to cooperate in transfer of that vehicle to Mynatt Truck's ownership.

"40. The court rejects plaintiffs' claim of damages related to a Model A car. The court finds that plaintiffs failed to prove that this loss was caused by any improper or unauthorized act of Collis.

"41. Credit card charges directly for the benefit of Collis' wife were made in the amount of $13,481.19. Plaintiffs should have recovery for those amounts, for which no corporate benefit was received."

The district court found that Collis defaulted on the promissory note securing his interest in shares of Mynatt Truck common stock and awarded Mynatt damages of $8,933.37 plus interest of $1.24 per day after January 15, 1999. The court also found in favor of Mynatt in regard to monies given to Collis for an investment in Hydraulic Repair & Engineering, Inc. (HRE) stock and awarded Mynatt $10,000 in damages.

The district court awarded damages to Mynatt Truck in connection with its claims against Collis for conversion, unjust enrichment, fraud, and breach of fiduciary duty. In addition, the district court found that Collis' conduct constituted both willful fraud and breach of fiduciary duty and awarded Mynatt Truck $125,000 in punitive damages.

The district court awarded Mynatt $8,933.37 plus interest for the amount owing on the promissory note and $10,000 for his interest in HRE stock. The district court also awarded the following damages to Mynatt Truck:

"• $17,100 for the pickup truck taken by Collis at the time of his resignation;
"• $46,928.45 in credit card charges that were his personal expenses paid for by the corporation;
"• $13,481.19 in credit card charges for the benefit of Collis' wife;
"• $39,964.43 for checks payable to cash;
"• $36,090.36 for checks written to various third parties for Collis' benefit;
"• $13,800 for the unauthorized trade-outs with Curth, Ronan Roofing, and Arborcare;
"• $5,000 for tools taken by Collis when he left the company; and
"• $2,074.62 in checks identified in category F on Exhibit HHHH."

In addition, the district court ordered Collis to take all reasonable and necessary steps to transfer ownership of an Army truck to Mynatt Truck. For purposes of calculating the interest due on damages, the district court found that the damages "were liquidated as of the dates suggested by plaintiffs."

The district court found that Mynatt and Mynatt Truck failed to sustain the burden of proof as to claims in regard to a Kubota Tractor, checks written for tools, the Century Lumber claim, questionable credit card charges, credit card charges for meals, loss on the sale of a Winnebago, damages related to the purchase of a

Model A car, and fraudulent conduct with respect to B&D Leasing. The court entered judgment for Collis on those claims.

The district court found in favor of Mynatt and Mynatt Truck on Collis' counterclaims for vacation pay and for breach of fiduciary duty and, thus, did not award any damages to Collis. However, the court held that "so long as [Collis] remains a partner of B&D Leasing, he shall be entitled to access to the partnership records and to an accounting of its financial transactions."

In their posttrial suggested findings of fact and conclusions of law, Collis and Hughes requested that the district court allow them to set off from the judgment against them the amount of a 1995 corporate distribution, any retained earnings of Collis at Mynatt Truck, and the amount of Collis' corporate ownership interest in Mynatt Truck. Collis and Hughes suggested that Collis was entitled to receive $128,142, the amount of the corporate distribution to him reflected on an amended corporate K-1 tax form for 1995.

After the district court entered judgment denying equitable setoff, Collis and Hughes once again asked the court to allow the equitable setoff in a motion to alter or amend. In addition, Collis and Hughes asked to be allowed to set off from the judgment in favor of Mynatt Truck monies they claimed Mynatt misappropriated from the corporation. Collis and Hughes also requested an amended journal entry reflecting the satisfaction of the judgment pertaining to the promissory note. At the hearing on the motion, the court ordered amendment of the journal entry of judgment to show that Collis had satisfied his obligations under the promissory note. The district court denied Collis' request for setoff, however.

An amended journal entry of judgment was filed on June 6, 2001. On June 25, 2001, Collis and Hughes appealed the findings and rulings of the district court. Mynatt and Mynatt Truck filed a cross-appeal concerning the trial court's admission of trial exhibits on July 16, 2001, but later moved to dismiss the cross-appeal. This court granted the motion to dismiss the cross-appeal. The remaining appeal was timely filed and comes before this court pursuant to a K.S.A. 20-3018(c) transfer.

## I. EQUITABLE SETOFF

Collis and Hughes assert that the trial court erred by refusing

to allow Collis an equitable setoff from the judgment against him, setting forth several reasons why the court's decision was in error. Collis and Hughes ask this court to remand the matter to the district court for a determination of the proper amount of setoff.

An appellate court's standard of review on a district court's determination regarding the remedy of equitable setoff is one of abuse of discretion. See *New Dimensions Products, Inc. v. Flambeau Corp.*, 17 Kan. App. 2d 852, Syl. ¶ 5, 844 P.2d 768 (1993) ("The denial of the remedy of setoff to a defendant who has violated the equitable 'clean hands' doctrine is within the discretion of the trial court."); *Carson v. Chevron Chemical Co.*, 6 Kan. App. 2d 776, 793, 635 P.2d 1248 (1981) (quoting *Taylor v. Taylor*, 180 Kan. 213, 218, 303 P.2d 133 [1956]) ("a setoff as between judgments is within the discretion of the court . . . it will only be disturbed . . . where it appears that the setoff has operated to the prejudice of a third party without notice . . . and he complains").

Collis and Hughes claim on appeal that the trial court should have allowed them to set off from the judgment against them the amount Mynatt misappropriated from Mynatt Truck. On appeal, however, Collis and Hughes no longer appear to claim that the district court should have allowed a setoff of the amount of the 1995 corporate distribution, Collis' ownership interest in Mynatt Truck, or any retained earnings Collis might have in Mynatt Truck.

We also note that Collis and Hughes do not appear to challenge any of the district court's findings of fact on appeal, but rather claim that the trial court erred as a matter of law. " 'Determinations of fact, unappealed from, are final and conclusive.' " *Powell v. Simon Mgt. Group, L.P.*, 265 Kan. 197, 199, 960 P.2d 212 (1998) (quoting *Justice v. Board of Wyandotte County Comm'rs*, 17 Kan. App. 2d 102, 109, 835 P.2d 692, *rev. denied* 251 Kan. 938 [1992]).

A. Statute of limitations

Collis and Hughes assert that although they may have been barred from recovering damages from a counterclaim due to the operation of the statute of limitations, the running of the statute

of limitations did not preclude Collis from obtaining equitable set-off.

The interpretation and application of a statute of limitations is a question of law for which the appellate court's review is unlimited. Likewise, the court's review of conclusions of law is unlimited. *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 472, 15 P.3d 338 (2000).

The district court specifically found in favor of Mynatt and Mynatt Truck in regard to Collis and Hughes' counterclaims. In its memorandum decision, the district court observed:

"Although Collis now complains about various payments made by the corporation for Mynatt's personal benefit, Collis was aware of virtually all of those expenses as they were made. Collis signed the checks and coded the payments for purposes of the corporation's accounting records."

"Collis' claims for breach of fiduciary duty against Mynatt are rejected for two reasons. First, with respect to virtually all of Collis' claims or potential claims, they are time-barred. Collis signed almost all of the checks, coded transactions for accounting purposes, and supervised all accounting functions; he was well aware each time that Mynatt wrote a check or used company funds that went for a personal use. Second, given the deceitful conduct set forth here on the part of Collis, Collis' knowledge of any wrongful conduct by Mynatt vis-a-vis the corporation, and the far greater scope of Collis' wrongful conduct, the court finds that a direct action by Collis against Mynatt personally should not be allowed here as it would 'interfere with a fair distribution of the recovery among interested persons.'"

Collis and Hughes contend that the district court erred in concluding that their counterclaims were barred by the statute of limitations rather than construing the counterclaims as requests for setoff. They assert that under K.S.A. 2001 Supp. 60-213(d), counterclaims are not time-barred when claimed as equitable setoff.

First, we consider whether the statute of limitations bars Collis and Hughes' request for equitable setoff. This court has previously stated: " 'Statutes of limitation are usually considered to be remedial rather than substantive, in that the remedy only and not the right or obligation is barred. . . .' " *Waechter v. Amoco Production Co.*, 217 Kan. 489, 519, 537 P.2d 228 (1975) (quoting *Rochester American Ins. Co. v. Cassell Truck Lines*, 195 Kan. 51, 55, 402 P.2d 782 [1965]).

" 'When considering the effect of the running of the statute of limitations this court is committed to the general doctrine, almost universally recognized by the courts and textwriters, that there is a substantial distinction between a claim asserted as a pure defense and one where affirmative relief is sought. Statutes of limitation are not intended to affect matters asserted strictly in the defense of an action. [Citations omitted.]'

. . . .

"As a general rule a setoff, counterclaim or cross-claim has the nature, characteristics and effect of an independent action or suit by one party against another. Accordingly, *in the absence of a statute to the contrary*, a demand pleaded by way of a setoff, counterclaim or cross-claim is regarded as an affirmative action in most jurisdictions, and therefore, unlike a matter of pure defense, is subject to the operation of the statute of limitations. [Citations omitted.]" (Emphasis added.) *Rochester American Ins. Co. v. Cassell Truck Lines*, 195 Kan. 51, 56, 402 P.2d 782 (1965).

Beginning in 1909, however, our legislature enacted statutes excluding cross-demands, counterclaims, and setoffs from the operation of the statute of limitations under certain specified circumstances. See *Rochester American Ins. Co.*, 195 Kan. at 57-58 (discussing L. 1909, ch. 182, § 102; G.S. 1949, 60-715; and K.S.A. 60-213[d] [Corrick]).

K.S.A. 2001 Supp. 60-213(d) states:

"When cross demands have existed between persons under such circumstances that, if one had brought an action against the other, a counterclaim or cross-claim could have been set up, neither can be deprived of the benefit thereof by the assignment or death of the other or by reason of the statute of limitations if arising out of the contract or transaction set forth in the petition as the foundation of plaintiff's claim or connected with the subject of the action; but the two demands must be deemed compensated so far as they equal each other."

The United States District Court for the District of Kansas has noted:

"In sum, the law of Kansas is that if the counterclaim is not brought before the running of the statute of limitations, then the counterclaim cannot be used as an affirmative action. However, the counterclaim can still be used as a pure defense or as a set off against the plaintiff's claim if the claim, '(a) coexisted with the plaintiffs' claim and (b) arises out of the "contract or transaction" on which the plaintiffs' claim is based.' " *Hatfield v. Burlington Northern Railroad Co.*, 747 F. Supp. 634, 641 (D. Kan. 1990) (quoting *Lightcap v. Mobil Oil Corporation*, 221 Kan. 448, 464, 562 P. 2d 1 [1977]).

Here, Collis and Hughes filed a counterclaim on April 14, 1997, alleging that on various dates Mynatt had dissipated corporate assets of Mynatt Truck for his own benefit in breach of his fiduciary duties. An action for an alleged breach of fiduciary duty is governed by the 2-year statute of limitations of K.S.A. 2001 Supp. 60-513. *Cornett v. Roth*, 233 Kan. 936, 940-41, 666 P.2d 1182 (1983). The statute of limitations would act to bar any affirmative action by Collis against Mynatt for breach of fiduciary duty 2 years after "the fact of injury [became] reasonably ascertainable." K.S.A. 2001 Supp. 60-513(a) and (b).

Collis admitted in his trial testimony that as early as 1990 he was aware that Mynatt had the corporation pay for some of his personal expenses. Collis did not become a shareholder in the corporation until September 30, 1993; however, Collis was appointed vice president and general manager of the corporation in 1990. "Officers and directors of a corporation occupy a strict fiduciary relationship with respect to both the corporation and its shareholders. The same fiduciary standard applies as between directors." *Newton v. Hornblower, Inc.*, 224 Kan. 506, Syl. ¶ 8, 582 P.2d 1136 (1978). Collis could clearly bring an action for breach of fiduciary duty against Mynatt after he was made a corporate officer in 1990. After he was made a corporate officer, Collis knew that the corporation was paying for Mynatt's personal expenses because he was responsible for the review and approval of bills and for determining to which general ledger account the bills were to be charged when paid. In the context of affirmative counterclaims, the district court correctly determined that the statute of limitations barred "virtually all of Collis' claims or potential claims" with the exception of the "check Mynatt wrote to himself in late 1995 for $17,000 to offset the Kubota tractor payments made by Collis for Collis' benefit."

As for Collis and Hughes' request for setoff, this court has stated that "even an outlawed claim may be used as a setoff if it (a) coexisted with the plaintiffs' claim and (b) arises out of the 'contract or transaction' on which the plaintiffs' claim is based." *Lightcap*, 221 Kan. at 464. While the term "transaction" may encompass a contract, it is larger in scope and more comprehensive than "contract" and may relate to matters entirely in tort. *United States Hoff-*

*man Machinery Corp. v. Ebenstein*, 150 Kan. 790, 792, 96 P.2d 661 (1939), *opinion adhered to on rehearing*, 152 Kan. 198, 103 P.2d 788 (1940). Collis and Hughes' claims generally can be said to arise out of the transaction on which Mynatt and Mynatt Truck's claims were based; however, we must determine whether Collis and Hughes' claims coexisted with the claims of Mynatt and Mynatt Truck.

Mynatt testified at trial that he began looking through corporate checks in approximately October or November 1995. Assuming that the fact of injury was reasonably ascertainable to Mynatt and Mynatt Truck at that time, an action for breach of fiduciary duty would accrue in October or November 1995 and remain viable until October or November 1997. As the district court noted, the only breach of fiduciary duty claim Collis could have possibly initiated against Mynatt accruing in late 1995 would be a claim in regard to the check Mynatt wrote to himself for $17,000 in compensation for the corporate funds Collis used for the Kubota tractor. Because both Collis and Mynatt could entertain claims "alive" from October or November 1995 through October or November 1997, we find that these particular claims coexisted. See *Lightcap*, 221 Kan. at 464.

Because Collis' claim for breach of fiduciary duty coexisted with Mynatt and Mynatt Truck's claim and arose from the same transaction which Mynatt and Mynatt Truck claimed in their petition, we conclude that Collis' claims against Mynatt individually for breach of fiduciary duty were not barred by the statute of limitations for the purpose of obtaining a setoff from the judgment awarded to Mynatt.

B. *Richards v. Bryan*

Next, Collis and Hughes assert that the district court erred in interpreting *Richards v. Bryan*, 19 Kan. App. 2d 950, 879 P.2d 638 (1994), as providing an alternative basis for denying Collis' request for setoff.

" 'This court's review of conclusions of law is unlimited.' [Citation omitted.]" *Powell*, 265 Kan. at 202.

Here, Collis and Hughes contend that Collis' counterclaims were authorized by the test in *Richards*. They argue that the district court misinterpreted the "fair distribution of the recovery" prong of the three-part test set forth in that case, considering that prong a balancing test of the respective wrongdoing of the parties rather than as a directive to consider the effect of recovery on any other nonparty shareholders.

In response to Collis and Hughes' assertion, Mynatt and Mynatt Truck argue that the Court of Appeals impermissibly exercised judicial legislation in *Richards* and urge this court to overrule that case. Alternatively, Mynatt and Mynatt Truck urge this court to uphold the district court's determination that Collis' counterclaims were impermissible because they would interfere with a fair distribution of recovery among all interested persons.

In their reply brief, Collis and Hughes contend that *Richards* was not a prohibited exercise of judicial legislation resulting in an expansion of K.S.A. 60-223a. They assert that because Mynatt relied on the trial court's interpretation and application of *Richards*, Mynatt may not argue on appeal that the holding should be overruled.

At the hearing on Collis and Hughes' motion to alter or amend, counsel for Mynatt and Mynatt Truck stated:

"But in our view, Your Honor, there are—it's three-fold. Perhaps the most significant is that under the *Richards v. Bryan* case this court found specifically that the claim in Mr. Collis' favor under the *Richards v. Bryan* case could not be sustained because it would interfere with a fair distribution of recovery among all interested persons, which is in violation of the *Richards v. Bryan* case. That is to say this Court made a specific express finding of fact which is fatal to that claim."

Judge Leben denied Collis' request for setoff, and stated:

"With respect to [Collis' and Hughes' request for set-off], I would say that I generally agree with each of the three rationales put forward by [counsel for Mynatt] in his responsive brief. I'll comment on a couple of them. I've already dealt with the *Richards v. Bryan* issue in the memorandum decision. With respect to the mutuality issue, I also agree with [counsel for Mynatt] that there was not a claim presented in the pretrial order related to the K-1 or against the corporation itself and, therefore, I do not believe that there is any mutuality which would be required for a set off. With respect to the last argument of a failure of proof, I agree with that as well and would add that my understanding of the evidence was

that the amended K-1 reflected transactions that had already occurred, not transactions that were about to occur. It was an amended K-1 for a prior year and it does not seem logical to me that it would be an indication that there was some further payment remaining to be made by the corporation to Mr. Collis. Certainly if that were in fact the case, as is now alleged by the defendant, proof that was persuasive to me certainly was not presented at trial. That was not my understanding of the significance of that document from the evidence that was presented, and I think [counsel for Mynatt] is correct that this does represent a failure of proof on behalf of [Collis and Hughes], even if such a claim was properly presented in the pretrial order and did not run afoul of the *Richards v. Bryan* rule. So, that will be the ruling of the Court on that motion."

Mynatt and Mynatt Truck did not argue before the district court that the Court of Appeals impermissibly exercised judicial legislation in *Richards* which should be overruled, and the district court never rendered a decision on it. To the contrary, Mynatt and Mynatt Truck relied on the district court's use of the *Richards* test to support the argument that Collis and Hughes were not entitled to equitable setoff.

"A new legal theory may not be asserted for the first time on appeal or raised in a reply brief. [Citation omitted.]" *Wood v. Groh,* 269 Kan. 420, 434, 7 P.3d 1163 (2000). Generally, a party is not allowed to raise an issue on appeal not presented previously to the district court or inconsistent with the position taken before the district court. *Baugher v. Hartford Fire Ins. Co.,* 214 Kan. 891, Syl. ¶ 6, 522 P.2d 401 (1974); *Pink Cadillac Bar & Grill, Inc. v. USF&G Co.,* 22 Kan. App. 2d 944, 955, 925 P.2d 452 (1996), *rev. denied* 261 Kan. 1086 (1997). None of the three exceptions to this general rule listed in *In re Conservatorship of Marcotte,* 243 Kan. 190, 196, 756 P.2d 1091 (1988), apply here. See *Associated Wholesale Grocers, Inc. v. Americold Corp.,* 261 Kan. 806, 827, 934 P.2d 65 (1997) (finding that the issue of the coverage period of an insurance policy was not contested before the district court and consequently was not properly before this court on appeal). Because Mynatt and Mynatt Truck failed to raise this issue before the trial court, this court will not consider it for the first time on appeal.

The remaining issue for our consideration is whether the district court misinterpreted the "fair distribution of the recovery" prong

of the three-part test, erring in its interpretation of *Richards* as providing an alternative basis for denying Collis' request for setoff.

In *Richards*, Donald Richards purchased 49% of the stock of Bryan Travel Service, a Kansas corporation, in 1982. The other 51% of the stock was owned by Bryan World Tours, Inc. (Tours). Richards served as president and chief executive officer of Bryan Travel Service and served on its board of directors. The other three positions on board of directors were filled by stockholders, directors, and officers of Tours. Richards served as president and chief executive officer for the first year without drawing a salary, and then drew a salary of $2,000 per month with no increase until the conclusion of his employment. The board of directors never authorized a dividend or bonus.

Tours afforded financial backing to Bryan Travel Service through a series of loans made without Richards' consent or knowledge and assessed interest against the loans. Bryan Travel Service was to repay the loans whenever there was any surplus cash flow. According to Richards, the loans were in reality capital contributions and the loan payments were disguised dividend payments for Tours.

In 1987, the board of directors of Bryan Travel Service became dissatisfied with Richards' job performance and resolved to either ask him to resign or to terminate him. After his termination, Richards, the minority shareholder, filed suit against the majority shareholder Tours, its directors, officers, and shareholders, alleging fraud, breach of contract, and breach of fiduciary duty.

The district court disposed of Richards' claims through a grant of summary judgment, and Richards appealed. The Court of Appeals noted that at the heart of Richards' fiduciary duty claim was the allegation that the defendants manipulated the financial papers of Bryan Travel Service to hide profits in order to avoid paying him additional compensation by way of dividends or bonuses. The Court of Appeals found that while Richards could bring an individual claim of injury for the termination of his employment, all other breach of fiduciary duty claims involved injuries to the corporation which should have been brought in a shareholders derivative action under K.S.A. 60-223a. However, the Court of Appeals noted:

"[A]n increasing number of courts [were] abandoning the distinction between a derivative and a direct action because the only interested parties [were] the two sets of shareholders. Furthermore, some courts have recognized that it is often difficult and futile to bring a derivative action against a closely held corporation. As explained by one authority, '[e]ven if a minority shareholder overcomes procedural hurdles in a derivative action, a strong disadvantage is that any recovery accrues to the corporation and hence remains under the control of the very parties who may have been defendants in the litigation.' [Citation omitted.] For this reason, some courts permit oppressed minority shareholders to bring direct suits for breaches of fiduciary duties by the majority, even though the minority shareholders' grievance is primarily based on damage to the corporation. [Citation omitted.]" *Richards*, 19 Kan. App. 2d at 962-63.

Relying in part on this court's holding in *Sampson v. Hunt*, 233 Kan. 572, 584-85, 665 P.2d 743 (1983), that " 'directors have the power to control and direct the affairs of the corporation, and in the *absence of fraud*, courts will generally not interfere on behalf of a dissatisfied stockholder with the discretion of the directors on questions of corporate management, policy or business,' " (emphasis added) the Court of Appeals crafted a close corporation exception to the requirement that a minority shareholder bring a derivative action. 19 Kan. App. 2d at 964. Noting that Richards had presented substantial evidence of fraudulent inducement, the Court of Appeals opined that this court "would recognize an exception to the requirement that a minority shareholder bring a derivative action when frozen out of the management of a close corporation through oppressive majority conduct." 19 Kan. App. 2d at 964.

The *Richards* court concluded that

"if a corporation is closely held, a court, in its discretion, may treat an action raising derivative claims as a direct action if it finds to do so will not (1) unfairly expose the corporation to a multiplicity of actions; (2) materially prejudice the interests of creditors in the corporation; or (3) interfere with a fair distribution of the recovery among all interested persons." 19 Kan. App. 2d at 965.

Mynatt and Mynatt Truck argue that the district court's determination that Collis' claims for breach of fiduciary duty should not be allowed because it would "interfere with a fair distribution of recovery" constitutes a negative finding. They assert that such a

finding cannot be disturbed absent a showing of arbitrary and capricious disregard of undisputed evidence.

"A negative finding by the trial court means the party with the burden of proof failed to meet that burden. An appellate court will not disturb such a finding absent proof of an arbitrary disregard of undisputed evidence, or some extrinsic circumstance such as bias, passion, or prejudice." *In re Estate of Haneberg*, 270 Kan. 365, Syl. ¶ 6, 14 P.3d 1088 (2000).

Collis and Hughes contend that the district court misinterpreted the third prong of the three-part test set forth in that case, incorrectly interpreting "a fair distribution of recovery" to mean a balancing test of the respective wrongdoing of the parties rather than as a directive to consider the effect of recovery on any other nonparty shareholders. We find that the district court's statements in the memorandum decision indicate that it applied an incorrect interpretation of the legal requirement of the third prong of the test. As such, the district court's conclusions in regard to the third prong cannot be characterized as a negative finding.

The *Richards* court cited within the opinion the persuasive authority of the American Law Institute's Principles of Corporate Governance: Analysis and Recommendations § 7.01(d), p. 733 (Tentative Draft No. 11, 1991). The American Law Institute subsequently adopted and promulgated § 7.01(d) on May 13, 1992, noting that although subsection (d) related to an issue infrequently faced by courts, the rule was "consistent with the trend of recent decisions." A.L.I., Principles of Corporate Governance: Analysis and Recommendations § 7.01(d), Comment *a*. Comment *e* of § 7.01(d) states:

"Essentially, § 7.01(d) follows the position taken by the Ninth Circuit in *Watson v. Button*, 235 F.2d 235 (9th Cir. 1956), which found that the usual policy reasons requiring an action that principally alleges an injury to the corporation to be treated as a derivative action are not always applicable to the closely held corporation. The facts of *Watson* are illustrative: a multiplicity of actions could not have resulted in that case, because there were only two shareholders; creditors could not have been injured, because each shareholder had agreed to be individually liable for corporate debts; finally, and *individual recovery would not have prejudiced the rights of any other shareholders*. . . . Although § 7.01(d) does not follow the fullest potential reach of *Donahue* to the extent of converting all intra-corporate disputes that would be normally characterized as derivative actions into

direct actions whenever the case involves a closely held corporation, *it gives the court discretion* to treat the action as direct if the policy considerations enumerated in Comment *d* are satisfied. In general, when a direct action is brought on behalf of the entire class of injured shareholders and the corporation's solvency is not in question, there is less reason to insist that the action be brought derivatively. The court should then have *equitable power* to treat the action as direct if the corporation is closely held . . . ." (Emphasis added.) A.L.I., Principles of Corporate Governance: Analysis and Recommendations § 7.01(d), Comment *e*.

The American Law Institute's comments appear to indicate that "a fair distribution of the recovery" requires a court to consider the effect of recovery on any nonparty shareholders as Collis and Hughes assert. Here, all interested shareholders were parties to the suit, and individual recovery would not have prejudiced the rights of any nonparty shareholders and thus would not have interfered with a fair distribution of the recovery.

However, even if we find the district court's holding was a misinterpretation of the third prong, Collis and Hughes' contentions ignore the obvious. In the case of a closely held corporation, the decision whether to allow a party to proceed with a direct suit in lieu of a derivative action is entrusted to the court's discretion. Even if all three prongs of the test were met, the district court, in its equitable power and discretion, could deny Collis and Hughes the ability to proceed directly.

"[A] trial court's reason for its decision is immaterial if the ruling is correct for any reason. [Citation omitted.]" *KPERS v. Reimer & Koger Assocs., Inc.*, 262 Kan. 110, 118, 936 P.2d 714 (1997). Because *Richards* entrusts the decision of whether to allow a direct action involving a close corporation to the court's discretion, the district court did not err in using that case as an alternative basis for denying Collis' request for setoff.

C. Doctrine of strict mutuality

Next, Collis and Hughes argue that strict mutuality is not required for an equitable setoff and assert that the district court erred as a matter of law by relying on the lack of strict mutuality between the parties as a basis for denying equitable setoff to them. Collis and Hughes request a remand to the district court to determine the proper amount of setoff that should be allowed.

The function of an appellate court is to determine whether the trial court's findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. Substantial evidence is such legal and relevant evidence a reasonable person might accept as sufficient to support a conclusion. See *Sampson v. Sampson*, 267 Kan. 175, 181, 975 P.2d 1211 (1999). An appellate court's review of conclusions of law is unlimited. *Lindsey v. Miami County National Bank*, 267 Kan. 685, 689-90, 984 P.2d 719 (1999).

At the posttrial hearing, the district court stated: "With respect to the mutuality issue, I also agree with [counsel for Mynatt] that there was not a claim presented in the pretrial order related to the K-1 or against the corporation itself and, therefore, I do not believe that there is any mutuality which would be required for a set off."

On appeal, Collis and Hughes do not challenge the district court's finding that they did not make a claim against the corporation itself in the final pretrial order. Collis and Hughes assert, however, that the district court erred in failing to allow them an equitable setoff against the judgment granted to the corporation solely because the parties lacked strict mutuality. Collis and Hughes contend that under equitable principles, a court is not bound by the fiction of a corporate entity and, thus, argue they did not need to plead or prove veil-piercing for the court to evaluate their claim for setoff against Mynatt and Mynatt Truck.

The thrust of Collis and Hughes' contention is that there is a well-recognized exception to the requirement of strict mutuality when a court's equitable powers are invoked. They maintain that when equitable setoff is requested, a court cannot simply deny setoff based on lack of mutuality alone, but must proceed to consider the facts and circumstances of the case before denying setoff.

In support of their contention that the exception to strict mutuality is well-recognized, Collis and Hughes cite three foreign cases: *Black & Decker Mfg. Co. v. Union Tr. Co.*, 53 Ohio App. 356, 4 N.E.2d 929 (1936); *Poultry Growers v. Westark Prod. Cred.*, 246 Ark. 995, 440 S.W.2d 531 (1969); and *Feucht v. Real Silk Hosiery Mills, Inc.*, 105 Ind. App. 405, 12 N.E.2d 1023 (1938).

Collis and Hughes also contend that the appellate courts of Kansas have recognized the equitable exception to strict mutuality in various contexts in *Carson v. Chevron Chemical Co.*, 6 Kan. App. 2d 776, 635 P.2d 1248 (1981); *Atchison County Farmers Union Co-op Ass'n v. Turnbull*, 241 Kan. 357, 736 P.2d 917 (1987); *Taylor v. Taylor*, 180 Kan. 213, 303 P.2d 133 (1956); *Docking v. Commercial National Bank*, 118 Kan. 566, 235 Pac. 1044 (1925); and in *Pierce v. Security Co.*, 60 Kan. 164, 55 Pac. 853 (1899). They claim that in *Carson* the Court of Appeals indicated that a court's failure to consider equitable setoff based solely on a lack of strict mutuality would be error.

Mynatt and Mynatt Truck present a two-part argument in support of the district court's decision not to allow Collis and Hughes a setoff. First, Mynatt and Mynatt Truck maintain that Kansas case law requires mutuality, *i.e.*, that the judgments be between the same parties, for setoff. They contend that the Kansas cases cited by Collis and Hughes did not concern nonmutual claims. In support, they cite *Alexander v. Clarkson*, 100 Kan. 294, 164 Pac. 294 (1917); *State ex rel. Stephan v. Commemorative Service Corp.*, 16 Kan. App. 2d 389, 823 P.2d 831 (1991); and *Mohr v. State Bank of Stanley*, 244 Kan. 555, 770 P.2d 466 (1989). Second, Mynatt and Mynatt Truck declare that even though an exception to the requirement of mutuality has not been specifically recognized in Kansas, should this court recognize the exception cited in Collis and Hughes' brief, Collis would fail to pass its application.

In *Atchison County Farmers Union Co-op Ass'n*, defendant Turnbull sought to set off his co-op equity credit account against a debt he owed to the plaintiff co-op on an open account. Equity credits are not an indebtedness presently due and payable, but instead represent an interest to be paid at an unspecified later date determined by the board of directors. Thus, Turnbull sought to set off an unmatured interest against a presently due judgment.

The bylaws of the co-op specified that equity credit accounts could be retired for members attaining age 65 or moving their farm operation from the co-op's territory. Turnbull argued that since he had not farmed since 1983, had not produced agricultural products since 1981, and had lost his home and all of his farmland, principles

of equity required that he be allowed to set off his co-op equity credits against his debt. There, this court recited the applicable rules relative to the case:

"To allow a debt not maturing during an action to be set off against one already due would be to change the contract and advance the time of payment. Equitable setoffs of unmatured obligations may be allowed under special circumstances, such as insolvency of the obligor or probable difficulty in collecting the obligation at maturity, but such setoffs are largely within the court's discretion." 241 Kan. at 361.

"An equitable setoff will be allowed when the party seeking it shows some equitable ground therefor, and it is necessary to promote justice, to avoid or prevent wrong or irremediable injustice, or to give effect to a clear equity of the party seeking it. There is some authority to the effect that the equitable grounds which will warrant overriding the statutory law have been limited to insolvency or nonresidence, but it is generally held that these are not the sole grounds. 80 C.J.S., Set-off and Counterclaim § 5." 241 Kan. at 362.

The trial judge overrode the co-op's bylaws and statutory law, adopting the principle of equitable setoff due to insolvency, and allowed Turnbull to set off his equity credits. On appeal, this court considered whether the trial judge could override statutory law (on cooperatives) and apply equitable principles, or whether the legislature had made a statement of public policy prohibiting the application of equity. Noting that "the granting or withholding of relief properly depends upon considerations of public interest," this court found that the declared public policy of Kansas was to encourage cooperative marketing associations. This court thus held that the "trial judge could neither grant an equitable setoff to Turnbull nor substitute his judgment for the Co-op's board of directors." 241 Kan. at 363.

*Atchison County Farmers Union Co-op Ass'n* involves mutual but not coexistent (presently due) debts. Because the question of nonmutual claims is not the focus of the decision, the case is not clearly on point.

Likewise, in *Taylor v. Taylor*, 180 Kan. 213, 303 P.2d 133 (1956), there was no question of mutuality of the parties because "certainly in an action for divorce and division of property there is mutuality of parties and of claims." 180 Kan. at. 218.

*Docking*, 118 Kan. 566, was a case where the receiver of an insolvent bank sought to establish the priority of his claim on a deposit account set up by the insolvent bank at Commercial National Bank. Commercial National Bank argued that its right to set off the indebtedness of the insolvent bank against the deposit account superceded the right of the receiver to the funds. Again, this case involves priority of claims on a deposit account and does not directly concern the question of mutuality between parties requesting a setoff of judgments.

In *Pierce*, 60 Kan. 164, the court considered whether a stockholder in a Kansas corporation who was statutorily liable to corporate creditors could, by way of setoff or defense, extinguish his liability to a judgment creditor of the corporation because the corporation was indebted to him on claims and demands greater than the value of his stock that accrued before he became liable to the third party as a stockholder. Under the statute, any creditor could institute an independent action against any stockholder for enforcement of corporate debts up to the value of his or her stock. 60 Kan. at 166.

The *Pierce* court found that "[t]he claim of the stockholder is not a set-off in its technical legal sense, but it is an equitable defense which he is entitled to make." 60 Kan. at 165. Whether the *Pierce* court was alluding to the lack of mutuality of the parties or pointing to the fact that the obligations did not arise from the same transaction is unclear. Because the *Pierce* court characterizes the claim of the defendant as an equitable defense, not a setoff, we decline to rely on *Pierce* as supporting the proposition that mutuality is not required for equitable setoff.

*Carson*, 6 Kan. App. 2d 776, the final Kansas case cited by Collis and Hughes, involved several lawsuits consolidated on appeal which arose after the herbicide Paraquat, manufactured by Chevron Chemical Co., failed to kill existing weeds after being applied to the no-till acreage of several farmers. In discussing the *Carson* case, the description of that case's complicated procedural history has been simplified to focus solely on the issue important here.

The second part of the *Carson* appeal discussed district court case No. 77-C-4, where Donald Johnson brought suit against de-

fendants Chevron Chemical Company and Waits Homegas, Inc., the retailer and applicator of the herbicide. Waits counterclaimed against Johnson for the amount of the herbicide bill. Almost 2 years before the jury verdict, Johnson assigned to Collingwood Grain Company the right to receive up to $50,000 of any proceeds awarded to him in the case after attorney fees were deducted. The jury awarded judgment to Johnson against Chevron in the amount of $28,350 and against Waits in the amount of $5,000. In addition, the jury awarded Waits $3,360 on its counterclaim against Johnson. After the verdict, Collingwood Grain filed a motion to intervene and asserted its right to priority in the judgments awarded to Johnson.

The district court held that Johnson's assignment to Collingwood Grain was valid, denied setoff of Waits' judgment against Johnson, and held that when Waits paid the judgment due, the proceeds should be forwarded to Collingwood Grain pursuant to its assignment. Waits appealed, asserting that the trial court erred in finding that no right of setoff existed.

The Court of Appeals refused to overturn the trial court's denial of setoff, stating that it was "apparent from the record that the trial court was cognizant of the rule in *Taylor* and was exercising its discretion in ordering that there be no setoff." 6 Kan. App. 2d at 793. The Court of Appeals noted that the trial court did not deny Waits' request because the possibility of a setoff did not exist, but rather justified its decision based on the trial court's discretionary power discussed in *Taylor*, which stated:

" 'It may be conceded that the mere fact that mutual judgments exist does not as a matter of right entitle a party to have one set off against that of the other. It has often been held, however, that a setoff as between judgments is within the discretion of the court to which the application is made, that the court shall take into consideration the equities between the parties or those claiming under them with notice thereof, and that if the court to which the application is made allows the setoff, it will only be disturbed in a case such as is under consideration here where it appears that the setoff has operated to the prejudice of a third party without notice of the equities when an assignment has been made to him and he complains.' [*Taylor*]180 Kan. at 218.

. . . .

" 'The mere existence of mutual judgments, though rendered in the same court and about the same time, does not entitle a party to an order or judgment of setting one of them off against the other upon demand.

" 'Whether the power to set off judgments shall be exercised is to be determined in every case upon equitable considerations, and it will never be done where it will operate as an injustice or infringe upon the substantial rights of others.' [Citation omitted.]" 6 Kan. App. 2d at 793.

Our review of *Carson* reveals that mutuality between Waits and Johnson was not in question and, thus, does not serve as justification for Collis and Hughes' proposition that strict mutuality is not required.

We turn now to the Kansas cases cited by Mynatt and Mynatt Truck. In *Alexander,* 100 Kan. 294, the court considered whether an equitable setoff should be allowed where one party had assigned his interest in a favorable judgment from the litigation to a bank. First, the court noted: "There is no objection to an equitable proceeding to set off one judgment against another unless intervening rights are prejudiced thereby." 100 Kan. at 297. Because a bank had acquired the assignment of Clarkson's judgment against Alexander and it was subject to a lien, the court saw no way to allow a setoff. The *Alexander* court stated:

" 'The existence of mutual judgments does not entitle a party to have one set off against the other arbitrarily as a matter of right. Whether application for set-off is by motion or through a proceeding in equity, it is to be determined upon equitable considerations, and is only allowed when it will promote substantial justice. This was the ruling in *Herman v. Miller,* 17 Kan. 328, where it was said that "the exercise of that power is in a measure discretionary, and it will not be exercised in cases in which it would be inequitable so to do." [Citations omitted.]

. . . .

" 'The setting off of one judgment against another is not a legal right, but is a matter of grace, and the question whether a set-off should or should not be decreed rests in the sound discretion of the court to which the application is made. . . . The action of a court of law in granting or refusing a set-off is governed by the principles of equity and justice, and allowed only where good conscience requires it. It will never be permitted when the effect would be to deprive a party of his legal rights." 100 Kan. at. 298.

"Before one judgment can be set off against another judgment there must be mutuality in those judgments and no contravening equities." 100 Kan. 294, Syl. ¶ 2.

Because the assignments of the judgments sought to be set off attached before the proceeding to set off the judgments had begun, the *Alexander* court found the judgments were not mutual and were never coexistent cross-demands in the hands of the parties. Thus, the court foreclosed the possibility of a setoff.

In *Commemorative Service Corp.*, 16 Kan. App. 2d 389, the Court of Appeals held that an individual defendant in a breach of contract action involving the sale of burial markers on a preneed basis through nine cemetery corporations could not set off amounts owed to him by the new owners of the corporations from the damages award against him because the new owners were not parties to the action. The court found that the defendant "seeks a remedy which is not possible within the context of the current litigation. The parties whom he contends he should be allowed to set off against are not parties to this action, and, obviously, he will have to seek another forum in which to assert those claims." 16 Kan. App. 2d at 407.

In *Mohr*, 244 Kan. 555, Tri-County, a farm implement dealership, obtained a judgment against the State Bank of Stanley (Stanley Bank) for recovery on checks forged by James Lloyd, a co-owner of Tri-County who had embezzled money from the company. Stanley Bank based its claim for setoff on Kansas Bankers Surety Company's (KBS) (surety for the bank) liquidated contract claim against Tri-County. The trial court denied Stanley Bank's motion for setoff and Stanley Bank appealed. There, this court wrote:

"Stanley Bank claims a right of setoff based on claims of KBS, not Stanley Bank. KBS is not a party to this action. Both KBS and its assignor, John Deere, contested previous efforts to bring them into this litigation.

"In *Alexander v. Clarkson*, 100 Kan. 294, 299, 164 Pac. 294 (1917), which is cited by Stanley Bank, this court found that there could be no setoff because the two judgments involved were not mutual. Stanley Bank relies on *Herman v. Miller*, 17 Kan. 328, 332 (1876). In *Miller* this court said, '[A] party must be the absolute and beneficial owner of a judgment before he can have it off-set a judgment against him.'

"KBS is obligated to reimburse Stanley Bank for the judgment in favor of Tri-County; however, KBS is not a party to this action and its claims against Tri-County arise from its settlement with John Deere, not its role as surety for Stanley

Bank. The judgment against Stanley Bank and the claims against Tri-County are not mutual for purposes of setoff. In addition, KBS' claims against Tri-County were not matured at the time of Stanley Bank's motion for setoff. . . . It was not an abuse of discretion for Judge Bouska in case No. 61,167 to deny Stanley Bank's motion for setoff.

. . . .

"At the hearing on the various motions, the attorney for KBS and Stanley Bank requested an evidentiary hearing on the factual issues raised by the motions. *Carson v. Chevron Chemical Co.*, 6 Kan. App. 2d 776, 635 P.2d 1248 (1981), is cited in support of the argument that an evidentiary hearing should have been held on the motion for setoff. In *Carson*, the trial court conducted a post-judgment hearing to determine the priorities in the proceeds of the judgment. The Court of Appeals did not address the issue of the appropriateness of an evidentiary hearing.

"In *Carson*, it was clear that *mutual judgments* were involved; therefore, the trial court found it necessary to conduct an evidentiary hearing.

"In the case at bar, it is clear, without any evidentiary hearing, that mutuality does not exist between Stanley Bank and Tri-County. Stanley Bank is not attempting to offset its own claim, but the claim of KBS, which is not a party to this action. In addition, even if there were mutuality, there is no judgment upon which to base a setoff. An evidentiary hearing was not necessary to make such a determination." 244 Kan. at 565-66.

From the Kansas cases cited by the parties, we are able to synthesize the following general precepts are applied by Kansas courts. First, setoff requires mutuality, meaning that the same parties owe a sum of money to each other. There must be at least two distinct debts or judgments that have matured at the time of the motion for setoff. The entities indebted to one another must both be parties to the litigation. In addition, the parties' judgments or debts must coexist, *i.e.*, both must be determined, presently due, and owing at the time of setoff. A district court need not conduct a postjudgment evidentiary hearing unless it is clear mutual coexisting judgments are involved. Further, the party seeking equitable setoff must demonstrate equitable grounds for its application. The setoff must not prejudice intervening rights. Moreover, an equitable setoff will not be upheld on appeal where it contradicts public policy. Finally, equitable setoff is not a legal right, but is a matter of grace, and the question whether a setoff should be decreed rests in the sound discretion of the court to which the application is made.

Although the district court properly denied equitable setoff based on the lack of strict mutuality between the parties, it is clear from the record that the district court considered the scope of the wrongful conduct of both parties and balanced the equities of both parties in coming to a decision. Collis and Hughes admit in their brief that the district court performed a balancing test of the respective wrongdoing of the parties. A party seeking equitable setoff must demonstrate equitable grounds for its operation. In its memorandum decision, the district court wrote that given the

"knowledge of any wrongful conduct by Mynatt vis-a-vis the corporation, and the far greater scope of Collis' wrongful conduct, the court finds that a direct action by Collis against Mynatt personally should not be allowed here as it would 'interfere with a fair distribution of the recovery among interested persons.' "

This statement is an indication that the district court did not find that Collis and Hughes had demonstrated equitable grounds for the application of the remedy of equitable setoff.

Mynatt and Mynatt Truck also maintain on appeal that (1) the unclean hands doctrine bars Collis from obtaining an equitable setoff; (2) Collis and Hughes cannot set off claims against Mynatt individually due to their failure to allege or prove a claim for alter ego or piercing the corporate veil; and (3) Collis and Hughes may not set off claims since the trial court did not find they were damaged. Because we are upholding the district court's decision to deny equitable setoff for the reasons discussed above, we need not address the remaining assertions of Mynatt and Mynatt Truck.

## II. PUNITIVE DAMAGES

Next, Collis asserts that the district court erred by granting punitive damages.

In *Hawkinson v. Bennett*, 265 Kan. 564, 605-06, 962 P.2d 445 (1998), this court detailed the proper standard of review in regard to an award of punitive damages. There, citing *Smith v. Printup*, 262 Kan. 587, 596, 938 P.2d 1261 (1997), we stated: "Prior to the enactment of K.S.A. 60-3701 and 60-3702, which places the calculation of the amount of punitive damages with the trial court instead of a jury, we applied an abuse of discretion standard when

reviewing a punitive damages award. [Citations omitted.]" The *Smith* court further explained:

" 'Subject to the provisions of K.S.A. 60-3701, the standard of review remains one of abuse of discretion. We must first determine whether the provisions of K.S.A. 60-3701 have been applied by the trial court in setting the amount of punitive damages. Once that determination has been made, the amount awarded will be set aside only upon a showing that the trial court abused its discretion, which is another way of saying that the action of the trial court was arbitrary, capricious, or unreasonable. See *Ensminger v. Terminix Intern. Co.*, 102 F.3d 1571 (10th Cir. 1996). We also have stated that '[w]hen determining the amount of punitive damages to be awarded under K.S.A. 1992 Supp. 60-3701, it is incumbent on the trial court to make sufficient findings of fact to afford meaningful appellate review thereof.' [Quoting *Gillespie v. Seymour*, 253 Kan. 169, Syl. 1, 853 P.2d 692 (1993) (*Gillespie II*.)]" 262 Kan. 597.

"Punitive damages, as well as actual damages, are proper where a breach of fiduciary duty is involved." *Newton v. Hornblower, Inc.*, 224 Kan. 506, Syl. ¶ 13, 582 P.2d 1136 (1978).

"To warrant an award of punitive damages, a party must prove to the trier of fact by clear and convincing evidence that the party against whom the damages are sought acted with willful or wanton conduct, fraud, or malice." *First Savings Bank, F.S.B. v. Frey*, 29 Kan. App. 2d 436, 441, 27 P.3d 934 (2001) (citing *Reeves v. Carlson*, 266 Kan. 310, 313, 969 P.2d 252 [1998], and K.S.A. 60-3702[c]).

Without contesting the district court's finding that Collis acted fraudulently and willfully, Collis and Hughes maintain that the district court failed to correctly apply K.S.A. 60-3702 in its determination of punitive damages.

Mynatt and Mynatt Truck maintain that the district court properly considered the list of seven factors in K.S.A. 60-3702(b) which a court "may" consider in awarding punitive damages.

First, Collis and Hughes contend that the punitive damage award should be reversed because the district court failed to consider the factors listed in K.S.A. 60-3702(b)(6) and (7). They argue that the district court did not look at these factors because the court did not set forth any findings regarding Collis' financial situation or the effect of the $299,523.48 compensatory award plus the $125,000 punitive damages award on the financial situation of Collis.

K.S.A. 60-3702(b)(1) through (7) lists statutory factors that may be used in determining the amount of the punitive damages award.

"(b) At a proceeding to determine the amount of exemplary or punitive damages to be awarded under this section, the court may consider:

(1) The likelihood at the time of the alleged misconduct that serious harm would arise from the defendant's misconduct;

(2) the degree of the defendant's awareness of that likelihood;

(3) the profitability of the defendant's misconduct;

(4) the duration of the misconduct and any intentional concealment of it;

(5) the attitude and conduct of the defendant upon discovery of the misconduct;

(6) the financial condition of the defendant; and

(7) the total deterrent effect of other damages and punishment imposed upon the defendant as a result of the misconduct, including, but not limited to, compensatory, exemplary and punitive damage awards to persons in situations similar to those of the claimant and the severity of the criminal penalties to which the defendant has been or may be subjected."

We find that the district court properly considered the factors listed in K.S.A. 60-3702(b) when it made its determination regarding punitive damages. The memorandum decision of the district court stated:

"14. Even when punitive damages may be awarded, whether to award them remains discretionary with the court. If awarded, a series of factors as set forth in K.S.A. 60-3702(b) are to be considered in determining the amount of those damages.

"15. Here, consideration of those factors suggests a significant award of punitive damages. Collis knew that serious harm would result from his misconduct. He knew that his misconduct would result in substantial financial gain for himself to the detriment of Mynatt and Mynatt Truck. Collis intentionally concealed his misconduct from Mynatt and Mynatt Truck, using the trust he had been given (in being virtually the sole person handling accounting functions) to hide his deceit."

In *Smith*, this court found:

"Punitive damages are in the nature of an equitable action. [Citation omitted.] The trial court must weigh the evidence presented to arrive at an award. In this case, the court carefully considered the provisions of K.S.A. 60-3701(b)(1)-(7). While the court does not make explicit the facts it found relevant for each factor, see *e.g., Patton v. TIC United Corp.*, 859 F. Supp 509 (D. Kan. 1994), *aff'd* 77 F.3d 1235 (10th Cir.), *cert denied* 135 L. Ed. 2d 1049 (1996), it is clear that the decision was made with the statutory provisions in mind." 262 Kan. at 600-01.

We find that even though the district court did not make an explicit statement of the facts relevant in its consideration of K.S.A. 60-3702(b)(6) and (7), the record reflects that the court considered all the statutory factors when making its determination regarding punitive damages.

Collis and Hughes further maintain that the punitive damages award constitutes an improper reward to Mynatt, the only other shareholder of Mynatt Truck, because he also engaged in inappropriate conduct toward the corporation. They argue that if the public policy in favor of punitive damages is to deter such inappropriate conduct, the contrary is accomplished by rewarding the majority shareholder's wrongful conduct.

Mynatt and Mynatt Truck contend that the district court's memorandum decision evidences its consideration of Mynatt's conduct and assert that Collis' own admissions at trial provide ample evidence of his willful or wanton conduct, fraud, or malice which justify the court's punitive damage award.

Here, the district court stated:

"16. Plaintiffs have sustained substantial attorney fees in pursuing this action. Because of Collis' actions in concealing his conduct, including the blacking out of records of his expenses and the concealment of other records, the expense in pursuing this action was significantly greater than it otherwise would have been. The court has reviewed the attorney fee billings of the plaintiffs.

"17. The court awards punitive damages in the amount of $125,000, which is the approximate amount of plaintiff's attorney fees and less than the maximum punitive damages that may be awarded under K.S.A. 60-3702(f). While the court recognizes that plaintiffs have had some attorney fee expenses after trial, so that this award will not completely pay plaintiffs' attorney fees, it believes that it is a fair punitive damage award on the facts found here. Some of Mynatt's own actions certainly encouraged sloppy, and sometimes illegal (with respect to the Internal Revenue Service), business practices at Mynatt Truck. While this does not excuse the conduct found here by Collis, it does militate somewhat against a higher punitive damage award.

"18. Plaintiffs have asked the court to specifically find that Collis' liability arises out of his fraud or defalcation while acting in a fiduciary capacity. If our language has been reasonably clear thus far, we trust that the findings we have already announced here satisfy plaintiffs' request. The court specifically finds that the damages awarded above for $46,928.45 in credit card charges that were Collis' personal expenses paid for by the corporation; for $13,481.19 for credit card charges paid for the benefit of Collis' wife; for $39,964.43 for checks payable to cash; for $36,090.36 for checks written to various third parties for Collis' benefit; for $13,800 for unauthorized trade-outs; and for $2,074.62 for the checks for personal benefit as set forth in category F on Exhibit HHHH all arose out of Collis' fraud or defalcation while acting in a fiduciary capacity."

## We have previously stated:

" 'Punitive damages are not given upon any theory that the plaintiff has any just right to recover them, but are given only upon the theory that the defendant deserves punishment for his or her wrongful acts and that it is proper for the public to impose them upon the defendant. No right of action for punitive dam-

ages is ever given to any private individual who has suffered no real or actual damage.' [Citation omitted.]

As one commentator explains:

" 'Punitive damages may be contrasted with compensatory damages, special damages, contract damages, restitution, or equitable damages, which, in contrast to punitive damages, are measured by the difference in the position of the party after the wrong as compared to that party's position before the wrong. These compensatory, special, contract, restitution or equitable damages are not intended to improve the position of the party injured or damaged as a practical consequence of their award.

" 'Indeed, punitive damages do not depend on the financial condition of the party wronged, but rather upon the financial wherewithal of the party at fault who has acted maliciously or oppressively. The amount of punitive damages is often said to be based upon the sum that is perceived to punish or to deter the offending conduct. That sum may depend upon the financial size and strength of the defendant, the degree of the community's outrage, and other factors. Punitive damages, accordingly, may enrich the recovering party, who obtains a windfall to the extent that he is placed in a better position than he enjoyed before the offensive conduct occurred.' [Citation omitted.]" *Smith*, 262 Kan. at 602-03.

Here, the district court awarded punitive damages because Collis' liability arose out of his fraud or defalcation while acting in a fiduciary capacity. The district court did not find that Mynatt's actions constituted a breach of his fiduciary duties; rather, it found his conduct "encouraged sloppy, and sometimes illegal . . . business practices." The district court carefully considered the effect of the punitive damage award on both parties. The award did not improve Mynatt and Mynatt Truck's position because it did not completely cover their attorney fees. The punitive damages awarded were in an amount less than the maximum punitive damages that could have been awarded under K.S.A. 60-3702(f). Further, it was appropriate for the district court to consider the amount of Mynatt and Mynatt Truck's attorney fees in its punitive damages computation. "Attorney fees and costs of litigation may be taken into consideration in arriving at the amount of punitive damages in an appropriate case. [Citation omitted.]" *Newton*, 224 Kan. 506, Syl. ¶ 14. The district court applied the provisions of K.S.A. 60-3701 and did not act arbitrarily, capriciously, or unreasonably in awarding punitive damages against Col-

lis. We therefore hold that the district court did not abuse its discretion in awarding punitive damages.

Affirmed.

LARSON, S.J., assigned. █